NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0609n.06

Nos. 14-5188; 14-5364

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 27, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| DEANDRE LAMONT BLACKMAN and | ) | STATES DISTRICT COURT FOR THE |
| DOUGLAS MARTIN, | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE:     DAUGHTREY, GIBBONS, and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.   Defendants Deandre Lamont Blackman and Douglas Martin were indicted, along with four other co-defendants, for their participation in a drug-trafficking conspiracy involving distribution of heroin, cocaine, oxycodone, and hydrocodone.  Blackman pleaded guilty to conspiracy and, based on his limited criminal history, received a prison sentence of 50 months.  Martin chose to stand trial and was convicted of conspiracy.  In addition, the jury found Martin guilty of threatening a witness, in violation of 18 U.S.C. § 1512(b)(1).  The district court sentenced Martin to serve concurrent prison sentences of 151 months.  On appeal, both Blackman and Martin challenge the reasonableness of their prison sentences.  Martin also contends that information gathered by

police during warrantless searches of his cellular telephones should have been suppressed and that the proof at trial was insufficient to support his conviction for witness tampering.

We find no reversible error in connection with the issues raised by defendant Martin and, therefore, affirm his conviction and sentence. However, we conclude that because defendant Blackman's sentence is procedurally unreasonable, it must be vacated and his case remanded for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 1:15 a.m. on March 15, 2013, Paris (Kentucky) police officers Abdullah Bholat and Matthew Reed were "running radar" on Lexington Road in separate police vehicles when Reed clocked a car traveling 83 miles per hour in a 55-mile-per-hour zone. Both officers gave pursuit and, after stopping the speeding vehicle, Officer Reed approached the car and noticed that all four windows had been rolled down, despite the fact that the temperature at that time was only 30 degrees. When he detected a strong smell of marijuana emanating from the car, Reed asked the occupants to step out of the vehicle.

Upon exiting, the front-seat passenger, Aniema Udousoro (also known as "James" and "Toy Story") volunteered that he possessed a gun, and Reed confiscated a .45 caliber Smith & Wesson M&P from a holster on Udousoro's hip. Officer Bholat meanwhile directed defendant Martin to step out of the car. After Martin gave his consent to a search of his person, the officer "pulled out four cell phones and a large sum of cash, which totaled $856," from Martin's left front pocket. A further search of the car by the police uncovered another cell phone and a small baggie containing a green, leafy substance that appeared to be marijuana.

The officers arrested Martin and Udousoro for public intoxication because both men appeared to be under the influence of marijuana. The driver of the car, Jessica Cavezza, was

charged with careless driving and also was taken into custody with Martin and Udousoro. The fourth occupant of the vehicle, Andre Hawkins, was not arrested immediately, but he nevertheless agreed to accompany the officers to the police station for an interview.

Once at the police station, observations of and discussions with the arrested individuals led to further discoveries. Specifically, Udousoro admitted that he had swallowed a baggie containing 49 oxycodone pills, a baggie that later was recovered from Udousoro's stool after he passed the baggie at a nearby hospital.[1] Additional caches of money also were recovered after the initial searches—$800-$850 from Udousoro's wallet and another $5,300 from one of Martin's pants pockets. Most damningly, one of the four occupants of the car directed police to a room in the Red Roof Inn in Lexington, Kentucky, that Cavezza, Hawkins, Martin, and Udousoro allegedly had visited 15 or 20 minutes before the 1:15 a.m. traffic stop that led to their arrests. Based upon observations made at the motel, the police detained the room's occupants, defendant Deandre Blackman and Chinail Terry, and obtained a warrant to search the area where Blackman and Terry had been staying. Execution of that warrant resulted in the confiscation of 18.6 grams of cocaine, almost three ounces of heroin, a bottle of 50 hydrocodone pills, digital scales, $2,298 in cash, a single .38 caliber bullet, and a bus ticket purchased by defendant Blackman that had been used by him to travel from Detroit to Cincinnati, Ohio, during the late-night and early-morning hours of March 13 and March 14, 2013. In light of those discoveries, the police then arrested Blackman and Terry for possession of the controlled substances.

Based upon the evidence obtained by the police, Blackman and Martin, along with Udousoro, Hawkins, Cavezza, and Terry, were indicted for conspiring from "a day in March 2013" through March 15, 2013, to possess with intent to deliver heroin, cocaine, oxycodone, and

---

[1] That recovery validated Cavezza's assertion to the police that, when their vehicle was stopped, the quartet was on its way to Millersburg, Kentucky, to sell pills to a couple known to Cavezza.

hydrocodone. Prior to trial, however, Blackman pleaded guilty to the charge against him. The district court sentenced Blackman to 50 months in prison, a sentence based in part upon an increase in his base offense level due to the district court's determination that cell-phone pictures of Blackman holding a firearm and of the firearm by itself indicated that the defendant possessed a dangerous weapon in connection with the offense. *See* U.S.S.G. § 2D1.1(b)(1).

Cavezza was released on bond on the condition that she remain under house arrest pending the resolution of the criminal case against her. While so restricted, Cavezza reported that she received a telephone call from a friend of hers who was an inmate in a detention facility. While she was on that call, defendant Martin, who at the time still was incarcerated, broke in on the conversation and suggested that he and Cavezza agree to name Hawkins as the major actor in the conspiracy. Moreover, during their phone conversation, Cavezza reported that Martin referred to her attorney and to her court date, as well as indicating that he would "pop up on Main Street" to visit Cavezza, but that he "d[id]'nt want to scare" her when he did so. Despite assuring Martin that she wouldn't be scared by his visit, Cavezza later claimed that she felt intimidated by the call because Martin never before had been to her house and, immediately after hanging up with Martin, she telephoned FBI Special Agent Michael Van Aelstyn to report her trepidation. As a result of Martin's actions, the government obtained a superseding indictment against him that not only included the prior conspiracy charge, but also added a count alleging that he "knowingly used, or attempted to use, intimidation, threats, or corrupt persuasion toward [Cavezza] with the intent to influence, delay or prevent her testimony in a jury trial or other official proceeding."

Cavezza, like Blackman, ultimately pleaded guilty to the conspiracy charge before going to trial. Unlike Blackman, she agreed to testify against Martin at his trial and provided

incriminating testimony concerning Martin's role in the drug-trafficking conspiracy. While on the witness stand, Cavezza claimed that she first knew Martin as her sister's supplier of oxycodone. In January or February of 2013, however, she herself began buying heroin from Martin or from Martin's associate—a woman known as "Tiny"—on almost a daily basis. On the afternoon of March 14, 2013, Cavezza sent a text message to one of the cell phones belonging to Martin that the police later seized in the early morning hours of March 15. In that text, Cavezza inquired whether Martin had any "food," a code word for heroin. According to Cavezza, she then met up with Martin and Udousoro later that day at Tiny's home, as directed by Martin.

Over the course of the next six hours or so, Cavezza observed Martin sell pills to an individual named Luke, drove Martin to the Red Roof Inn to obtain cocaine to sell to another person, heard Martin instruct Blackman in the Red Roof Inn room on how to weigh and bag cocaine for sale, and drove Martin to a subdivision near the motel where he sold a bag containing either heroin or cocaine to a person living there. Eventually, Cavezza, Martin, and Udousoro ended up at the apartment of a women named Desiree, one of Martin's girlfriends. As the trio was leaving Desiree's residence, a man later identified as Andre Hawkins joined them in the car, and they drove back to the Red Roof Inn in Lexington. Once in the parking lot of the motel, Martin called Blackman and directed him to come down from the motel room to Cavezza's car. When Blackman arrived at the vehicle, Martin handed him "a bundle of white powder" before Cavezza, Martin, Udousoro, and Hawkins drove away toward Millersburg and their eventual encounter with the police.

During its case-in-chief, the government also elicited testimony from FBI Agent Aelstyn. Before the jury, he not only corroborated that Cavezza had contacted him and expressed her fear after receiving the telephone call from Martin, but he also explained in court that the FBI

possessed the capability to recover texts, call logs, and other data sent or received on cell phones. He then detailed for the jury information retrieved from one of the phones taken from Martin that indicated that Cavezza and Martin indeed had exchanged text messages regarding purchases of heroin from the defendant.

Martin himself was the sole witness called by the defense at trial. Not surprisingly, he denied his involvement in the drug-trafficking conspiracy and claimed that he had driven with Udousoro and Terry to Lexington from his home in Detroit for the sole purpose of celebrating his birthday with two of his girlfriends who lived in the Lexington area. He further stated under oath that he did not provide oxycodone pills to Cavezza, that he did not instruct Blackman on how to weigh or package cocaine, and even that the cell phone that contained the incriminating text messages was not his and had not been in his pocket.

Presented with the conflicting accounts of the activities of March 14 and 15, 2013, the jury chose to credit the testimony of the government witnesses and found Martin guilty both of conspiracy and of tampering with a witness. After a sentencing hearing, the district court imposed upon Martin concurrent, within-Guidelines prison sentences of 151 months.

Blackman now raises on appeal a single sentencing issue, and Martin raises issues challenging both his convictions and his sentence.

## DISCUSSION

### Blackman's Challenge to the Two-Level Firearm Enhancement

In his sole issue on appeal, defendant Blackman asserts that the district court erred in calculating his sentence when it applied a two-level enhancement for his alleged possession of a firearm in the commission of the offense of conviction. *See* U.S.S.G. § 2D1.1(b)(1). He argues

that because no firearm was recovered from his person or from the motel room in which he was staying, the sentence imposed upon him was procedurally unreasonable.

As has been well established, "[w]e review a district court's sentencing determination, under a deferential abuse-of-discretion standard, for reasonableness." *United States v. Pearce*, 531 F.3d 374, 384 (6th Cir. 2008) (citation and internal quotation marks omitted). That reasonableness review "has both a procedural and a substantive component." *United States v. Erpenbeck*, 532 F.3d 423, 430 (6th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51.

Blackman's guilty plea to the charge of conspiracy to possess with intent to deliver controlled substances resulted in an applicable base offense level of 24. Because Blackman demonstrated his acceptance of responsibility for his actions, because he timely notified authorities of his intention to plead guilty, and because he "provided complete information to the government concerning his own involvement in the offense," the district court agreed to reduce that offense level by three. However, the computation then was adjusted upward two levels based upon the court's finding that Blackman possessed a firearm in connection with the underlying conspiracy offense. The final offense level of 23, in conjunction with Blackman's applicable criminal history category, resulted in an advisory Guidelines sentencing range of 46-57 months, leading the district court to sentence Blackman to 50 months in prison. Without the

two-level increase, Blackman would have been subject to an advisory Guidelines range of only 37-46 months.

The government readily conceded and the district court found that no firearm was recovered from Blackman at the time of his arrest and that no firearm was found in the Red Roof Inn room in which Blackman was staying. Nevertheless, the district court justified the application of the § 2D1.1(b)(1) enhancement in large part based upon a photograph taken by Blackman on his cell phone that showed him holding a gun. In the government's own response to Blackman's objection to application of the enhancement, however, the prosecution admitted that the cell-phone photograph was taken at 12:01 p.m. on March 12, 2013, more than 34 hours prior to Blackman's departure from Detroit by bus for Cincinnati, Ohio, and, eventually, for Lexington, Kentucky. Although additional pictures retrieved from the defendant's cell phone included depictions of large quantities of controlled substances, photographs that the government attempted to link with the March 12 photograph, those pictures of "dealer amounts of drugs" "were created on March 14, 2013," a full two days after the "selfie" of the gun-toting Blackman.

Nevertheless, the district court concluded "that the gun was possessed during the course of and in the scope of the conspiracy." According to the district judge, the indictment in this matter alleged a conspiracy beginning "[o]n or about a day in March 2013, the exact date unknown, and continuing through on or about March 15, 2013." Given this lack of specificity, Blackman's possession of the firearm prior to arriving in Lexington "would be within the time period that is charged in the indictment to which he entered a plea," at least theoretically. Furthermore, as the district court explained:

> [J]ust because the gun [w]as not found in the room does not mean it didn't travel to Lexington, but also this defendant did have actions. He had to take some actions before traveling to Kentucky to engage in this conspiracy, and the Court does find that he possessed it in this regard as well.

* * * * *

The Court also would cite the parties to the fact that [a .38 caliber] bullet that was found inside the hotel room is some indication, although not the tipping point, it is some – it's some information the Court can consider that a weapon, other than the weapon that Mr. Udousoro possessed travelled to Lexington. There would be no reason to have a bullet without a gun.

Application Note 11(A) to § 2D1.1 specifies simply that the two-level enhancement of § 2D1.1(b)(1) "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Earlier Sixth Circuit cases interpreting the Guidelines section construed the Application Note to require the government to establish "that (1) the defendant actually or constructively 'possessed' the weapon, and (2) such possession was during the commission of the offense." *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996) (citation omitted). In *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003), however, we recognized that "[e]ffective November 1, 1991, . . . the guidelines removed the requirement of the weapon being possessed during the commission of the offense. Since that date, all that the government need show is that the dangerous weapon be possessed during 'relevant conduct.'" Thus, for purposes of this case, the enhancement may apply if a firearm was possessed by Blackman "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," or if the possession "were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. §§ 1B1.3(a)(1)(B) and (a)(2).

"Once the government meets its burden, a [rebuttable] presumption arises that the weapon was connected to the offense." *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012) (citations and internal quotation marks omitted). That presumption leads to the application of the two-level enhancement unless "the defendant [shows] that it was 'clearly improbable' that

the weapon was connected to the offense." *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (citation omitted).

We review factual findings made by the district judge at sentencing only for clear error. *Id.* A court's factual finding will be considered "clearly erroneous" if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citation omitted). The sentencing court's finding, however, still must be supported by "some minimum indicium of reliability beyond mere allegation." *United States v. Robison*, 904 F.2d 365, 371 (6th Cir. 1990) (citation omitted). And, in the end, "[t]he burden is on the government to prove, by a preponderance of the evidence, that a particular sentencing enhancement applies." *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003) (citation omitted).

Only through supposition and "mere allegation" could the district court in this case reach the conclusion that Blackman's cell-phone picture of himself with a firearm necessarily connected that firearm with the drug-trafficking conspiracy or any relevant conduct related to that conspiracy. As the government's own trial testimony made clear, the "incriminating" photo of Blackman holding a firearm was taken days before the defendant's arrival at the Red Roof Inn in Lexington, and there is no indication in the earlier photograph that Blackman was, at the time of the taking of the picture, in possession of controlled substances or acting in concert with Martin, Udousoro, Hawkins, or any other individual in the possession or distribution of heroin, cocaine, oxycodone, or hydrocodone. In an attempt to link the March 12 photo with the activities of March 14 and March 15 that occurred more than three hundred miles away, the district court intuited that Blackman "had to take some actions before traveling to Kentucky to engage is this conspiracy." Although logically true, neither the government nor the district court

point to any evidence that *the cell-phone picture itself* was taken in connection with conspiratorial actions. Indeed, this court has recognized in other instances that "[t]here may be situations where the facts demonstrate that a defendant possessed a firearm for a legitimate purpose unconnected to any criminal activity, and that his possession of the firearm was therefore not part of the same course of conduct as the crime of conviction." *United States v. Partington*, 21 F.3d 714, 719 (6th Cir. 1994). Because he pleaded guilty before trial, and because he did not testify under oath at his sentencing hearing, it is true that Blackman did not offer evidence of his legitimate, innocent possession of the firearm in the cell-phone photo. Equally true, however, is the fact that the government offered absolutely no evidence to the contrary. In short, the district court's "factual finding" that the gun appearing in the picture taken in Detroit was possessed in connection with the illegal acts that occurred in Kentucky is based not upon evidence, but upon supposition, conjecture, and speculation only.

In an effort to mask this evidentiary insufficiency, the government relies almost exclusively on the case of *United States v. Moore*, 416 F. App'x 715 (10th Cir. 2011), for the proposition that "[t]he pictures on Blackman's cellphone provide ample evidence that he was in possession of a firearm while committing the drug trafficking offense, even though the firearm was not recovered." Reliance upon *Moore* is unavailing for multiple reasons, however.

First, *Moore* is an unpublished opinion. Although Rule 32.1(a) of the Federal Rules of Appellate Procedure provides that a court may not restrict the citation to such "not for publication" opinions issued on or after January 1, 2007, the Advisory Commission Notes to that rule make clear that the text of the rule "says nothing about what effect a court must give to one of its unpublished opinions or to the unpublished opinions of another court." Filling that void, the Sixth Circuit's own Rule 32.1(b) explicitly provides that only "[p]ublished panel opinions are

binding on later panels." *See also Tanner v. Yukins*, 776 F.3d 434, 441 (6th Cir. 2015) (unpublished opinion lacks precedential value).

Second, *Moore* not only is not designated for publication, it was not even decided by a panel of this court. Although we may look to other circuit's opinions for guidance, "we recognize that we are not bound by the law of other Circuits." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 278 (6th Cir. 2010) (citations omitted).

Third, and most important, *Moore* is so factually distinguishable from Blackman's case that it provides little assistance in addressing the issue the defendant now raises in his appeal of his sentence. Moore was a passenger in a vehicle stopped by the police. The arresting officers observed two firearms in the vehicle, one on the driver's seat and another underneath the passenger's seat. Because Moore had been convicted of two felonies at different times earlier that same year, he was charged in federal court with being a felon in possession of a firearm, in violation of the provisions of 18 U.S.C. § 922(g)(1). *Moore*, 416 F. App'x at 716. Moore eventually pleaded guilty to the charge. The presentence report prepared for Moore's sentencing hearing noted that a cell phone seized from Moore contained a photograph of Moore holding three firearms, none of which were the weapons recovered from the vehicle upon Moore's arrest. *Id.* at 717. Because that photo was created after Moore's earlier felony convictions, the government sought to enhance Moore's offense level, arguing that the possession of the three firearms in the picture, taken when Moore was a convicted felon, "and thereby prohibited from possessing firearms, . . . would constitute relevant conduct." *Id.*

The very recitation of the facts in *Moore* highlights the stark differences between that case and Blackman's. The photo taken from Moore's cell phone unmistakably memorialized Moore's commission of a crime—a crime that was identical to the one for which he then was

being sentenced. By contrast, nothing in the firearm photos extracted from Blackman's phone provides an explicit nexus to the defendant's actions in weighing and packaging drugs in a motel room in Lexington, Kentucky. In fact, the government has not alleged that Blackman's possession of the firearm depicted in the photo was illegal, nor did anything in the photo suggest that the defendant's possession of the firearm was connected in any way with the drug-trafficking conspiracy or, indeed, any drug offense whatever.

In the discussion of his reasons for applying the two-level sentencing enhancement, the district judge made reference to the .38 caliber bullet that was determined to be in Blackman's possession when he was arrested. Although claiming that the presence of the bullet was not a dispositive factor in the sentencing determination, the district judge rationalized that "[t]here would be no reason to have a bullet without a gun." But, the government adduced absolutely no proof that the bullet belonged to any gun involved in the conspiracy or that other ammunition of comparable caliber was found on or near any of the charged co-conspirators. Obviously, the .38 caliber bullet was not possessed to arm the .45 caliber weapon confiscated from Udousoro, and the government also offered no evidence that the bullet was compatible even with the firearm pictured in the cell-phone photo. The possession of the single bullet thus lends no support to the government's position on this issue. Put simply, although a sentencing judge is permitted to make reasonable inferences from the evidence when determining whether to impose an enhancement, *see United States v. Vandewege*, 561 F.3d 608, 609 (6th Cir. 2009); *United States v. Pillault*, 783 F.3d 282, 286-87 (5th Cir. 2015) (citation omitted), in light of the foregoing, we conclude that the district judge's conclusion as to this enhancement was unreasonable.

To the extent that the government's reference to the bullet can be considered merely an attempt to balance factors that a sentencing court should consider "when determining whether

the application of a Section 2D1.1(b)(1) enhancement was appropriate," *Greeno*, 679 F.3d at 515, even that effort is mistimed and irrelevant for purposes of this appeal. In *Greeno*, we listed the following factors to be considered before applying the firearm enhancement:

> (1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) *the presence of ammunition*; (4) the proximity of the weapon to illicit drugs, proceeds, or paraphernalia; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking, rather than mere manufacturing or possession.

*Id.* (emphasis added) (citations omitted). However, those factors, "none of which is alone controlling," *id.*, come into play only *after* the district court concludes that the government has met its initial burden of showing "that the dangerous weapon [was] possessed during 'relevant conduct.'" *Faison*, 339 F.3d at 520. In this case, the district court erred in finding that the government did indeed satisfy that burden, given that no testimony or physical evidence—indeed nothing other than pure speculation—tied Blackman's participation in any drug-trafficking to the firearm in the photograph recovered from his cell phone.

As a consequence, we conclude that the district court unreasonably applied the two-level enhancement of § 2D1.1(b)(1) to Blackman's base offense level. The sentence must therefore be vacated and the case remanded for resentencing.

**Martin's Challenge to the Warrantless Search of His Cell Phone**

Defendant Martin contends that his right to be free from unreasonable search and seizure under the Fourth Amendment was violated when the police, without a warrant, accessed information on his cell phone—information that corroborated the fact that he had been engaged in drug-trafficking activities. Specifically, he points to recovered text messages he sent to Jessica Cavezza in which Martin referenced providing her with "20 packs" and "trays of food"— phrases denoting heroin—and in which he expressed his "need to get rid of these 15s"—meaning

15-milligram tablets of oxycodone. Martin bases his objection to the admission of trial testimony about those text messages on the recent United States Supreme Court decision in *Riley v. California*, 134 S.Ct. 2473 (2014), in which the Court ruled "that a warrant is generally required before [a search of information contained on a cell phone], even when a cell phone is seized incident to arrest." *Id.* at 2493. According to Martin, because *Riley* was decided during the pendency of this direct appeal, its holding is applicable to him, even though the *Riley* ruling was not released until after Martin was convicted. *See, e.g.*, *United States v. Buford*, 632 F.3d 264, 269 (6th Cir. 2011) ("It is firmly established that a decision of the Supreme Court declaring a new constitutional rule applies 'to all similar cases pending on direct review.'" (citing *Griffith v. Kentucky*, 479 U.S. 314, 322-23 (1987))).

However, because Martin did not object to the introduction of this evidence at trial, he has forfeited this issue on appeal, and accordingly our review is for plain error affecting Martin's substantial rights, as Martin himself concedes, *United States v. Houston*, _F.3d_, No. 14-5295, 2015 WL 4114604, at *2 (6th Cir. July 9, 2015). Thus, in order to obtain reversal, Martin "must show that [the search of his cell phone was] 1) error, 2) that is plain, and 3) that affects substantial rights, and if so, he must persuade us that 4) the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Yancy*, 725 F.3d 596, 601 (6th Cir. 2013) (citation and internal quotation marks omitted).

It is true that "[t]he text messages recovered from the cell phones found on Martin's person directly implicated him in drug trafficking." Other trial testimony, however, also linked Martin directly to the conspiracy to distribute various controlled substances. Chief among that testimony was the evidence offered by Cavezza. Indeed, even Martin concedes in his brief that "Cavezza's testimony was highly incriminating." Nevertheless, he argues that, without the

corroboration offered by the text messages sent by Martin, the jury *might not* have credited Cavezza's testimony given both her admission that she was under the influence of narcotics during the relevant time period and her motivation to provide a narrative supporting the prosecution's theory in order to obtain favorable treatment for herself.

However, an examination of Cavezza's trial testimony in December 2013 reveals that, as a witness, she was incredibly detailed in her recall of events that occurred nine months earlier. Standing alone, her own inculpatory statements and her eyewitness account of Martin's participation in the conspiratorial acts provided the jury with overwhelming evidence of the guilt of all the co-conspirators. Moreover, her testimony concerning Martin's delivery of a bag of a white powdery substance to defendant Blackman was corroborated not only by the testimony of Chinail Terry that she received a telephone call to have Blackman meet other co-conspirators downstairs in the parking lot of the Red Roof Inn, but also by the fact that the arresting officers found in the motel room a bag of cocaine or heroin that matched the description of the package Cavezza claimed Martin handed to Blackman.

It can never be said with absolute certainty in any case that the elimination of one piece of evidence or one sentence of oral testimony would not have affected the verdict returned by a jury. In this case, however, the overwhelming evidence of Martin's guilt, separate from the text messages recovered from two of his four cell phones, is sufficient for us to conclude that Martin fails to establish plain error.

**Martin's Challenge to the Sufficiency of the Evidence of Witness Tampering**

Martin also challenges the sufficiency of the evidence adduced at trial to convict him of tampering with a witness, a conviction that resulted in a prison sentence to run concurrently with his 151-month sentence for conspiracy. When challenging the legal sufficiency of the evidence

to support a guilty verdict, a defendant bears a "heavy burden." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir.) (citation omitted), *cert. denied*, 135 S.Ct. 196 (2014). In fact, when reviewing such a challenge, we ask simply "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Moreover, when engaged in such a review, "[w]e do not insert our own findings of fact; rather, we give full credit to the responsibility of the jury to weigh the evidence, to make credibility determinations, and to draw inferences." *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (citing *Jackson*, 443 U.S. at 319).

Pursuant to the relevant provisions of 18 U.S.C. § 1512(b)(1), criminal liability is imposed upon any individual who "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding." In Count 3 of the superseding indictment returned against Martin, the federal grand jury charged that Martin's July 26, 2013, telephone conversation with Jessica Cavezza from a detention facility was an attempt to influence Cavezza's testimony in Martin's trial by conveying to Cavezza that Martin was aware of details of her criminal case and knew where she lived.

At trial, the prosecution played in open court a tape recording of that phone conversation. Martin argued then, as he does now, that a rational trier of fact could not have considered the call threatening because the recording confirms that Martin spoke to Cavezza in a calm, measured tone throughout. Furthermore, he contends that any references he made to Cavezza's case, to her attorney, to his intention to "pop up on Main Street" to visit her, or to his desire not to scare her were examples of innocent banter, not attempts to threaten her or influence her testimony.

Martin's impression of the conversation was drastically different from that of Cavezza, who testified under oath at the trial that Martin expressed during the call his desire that she blame all criminal acts on Andre Hawkins. Although she admitted on cross-examination that Martin never specifically mentioned that he would retaliate against her if she did not testify as Martin suggested, Cavezza claimed that she felt intimidated and threatened when Martin spoke of visiting her at her residence, especially because he had never been to her home before. Even though she expressed to Martin that she was not scared, she claimed that her projected bravado was false and that, immediately after she ended the call with Martin, she contacted the FBI and expressed her concerns.

The jurors listened to the recording of the telephone conversation and evaluated the trial testimony of both Cavezza and Martin. After doing so, they unanimously determined that Martin was not a credible witness and that his efforts to influence Cavezza's testimony, coupled with his comments that he was monitoring Cavezza's own proceedings and that he knew where she lived, were sufficient to establish his guilt of the witness-tampering charge beyond a reasonable doubt. In finding Martin guilty of the crime, the jury well could have concluded that the tone or volume of the defendant's voice on the call was of minimal relevance to a determination of the defendant's intent in making the call, especially when viewed in light of the fact that Cavezza, an individual familiar with Martin, had such a strong and immediate reaction to the message that she wasted no time in informing federal law enforcement officials of the perceived threat. Because this court cannot second-guess the credibility determinations of the jury, there exist no grounds on which to disturb the fact-finders' verdict on this charge.

**Martin's Challenge to the Substantive Reasonableness of His Sentence**

In a final issue, Martin objects to his 151-month prison sentence, arguing that the punishment imposed was substantively unreasonable. An appellate review of the substantive reasonableness of a sentence "will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S. at 51. "A sentence is substantively unreasonable if the sentencing court arbitrarily selected the sentence, based the sentence on impermissible factors, failed to consider pertinent [18 U.S.C.] § 3553(a) factors, or gave an unreasonable amount of weight to any pertinent factor." *United States v. Cunningham*, 669 F.3d 723, 733 (6th Cir. 2012) (citation omitted). The reviewing court "may apply a rebuttable presumption of reasonableness to sentences within the Guidelines," *Pearce*, 531 F.3d at 384 (citing *Gall*, 552 U.S. at 51), and may not reverse a district court's sentencing determination simply because we "might reasonably have concluded that a different sentence was appropriate." *Gall*, 552 U.S. at 51.

In his challenge to his sentence, Martin argues only that the district court based its sentence on an impermissible factor, namely, that the judge was unduly focused upon the defendant's present marital status, Martin's marital status at the times the defendant's children were born, and Martin's infidelity. Such considerations are inappropriate when considering the proper sentence to be imposed for a drug-trafficking conspiracy, and it is undeniable that the district court did question Martin at length about such issues. However, the court's inquiry was triggered by Martin's own request that the court extend leniency based on the fact that he had seven children. The district judge, familiar with information in Martin's presentence report, interrupted and asked, "Are all of your children illegitimate? Have you been married to any of the mothers of these children?" When Martin attempted to explain that he had lived with the

mother of five of the children "[i]n common law marriage," the district judge retorted, "So it's

common law marriage but never through an official ceremony recognized by a state?"

Martin then continued with his statement to the court and sought to portray himself as a

positive role model and influence on his sons. The district judge responded:

> And you tell me that you're a good family man. You've been with the same woman now for a number of years, but you testified at trial that you were down here in Kentucky partying. You're coming down here to see two separate women. You had a room because it was your birthday at the Ramada Inn. You were going to go out and stay with the one woman, and you had already been with another while you were here. And I'm a little confused about being a good family man how all that fits in. Maybe you can explain it to me.

Later, the district judge continued in the same vein:

> My questions to you are related to the fact that I've gotten all these letters and statements that you've made about what a good family man you are and how you need to be out supporting your children.
>
> And so I've asked you if you were married to the women that you had these children with, and you told me that it's common law marriage.
>
> But then at trial you really—you didn't portray yourself as a family man at trial. Just the opposite, a playboy coming down here to Kentucky to party for your birthday. These women wanted to see you on your birthday. You didn't have anything to do with drugs, although, you brought Mr. Udousoro with you, or you two came together, and he brought the lady from the—from the gentlemen's club. But you're still a good family man.
>
> So I'm just trying to find out because you give inconsistent statements, and what I think is inconsistent testimony, throughout this proceeding. And I'm just trying to get to the bottom of this and find out what's the truth. I don't know if I heard it from you yet.

If the district court had based its sentencing determination on its negative reaction to

Martin's view of commitment and fidelity, well-established sentencing principles undoubtedly

would require us to vacate the defendant's sentence and remand the matter for resentencing.

However, examination of the complete transcript of Martin's sentencing hearing establishes that

the district judge based Martin's sentence upon valid considerations and that he even resisted the

temptation to sentence the defendant above the advisory Guidelines range. In fact, the court explicitly disavowed its reliance upon inappropriate considerations by explaining:

> I don't know what type of father the defendant is. I can't make that determination based upon letters that are submitted. I don't know what type of a spouse that he is. I have impressions based upon the testimony that was presented during trial and his own statements to the Court, but I can't make that determination.

Turning to the considerations that *did* factor into the sentencing determination, the district court emphasized that Martin "has not accepted responsibility for his actions," that "he lied on the witness stand," that "[t]his particular offense is a very serious offense," that Martin "has not shown respect for the law," that Martin did not take personal responsibility for this actions, and that "until he does that, he's a very serious risk of reoffending, and in doing so, of course, he's a danger to the public." Each of these concerns constitutes a valid basis for imposition of a sentence and, in the end, the district judge relied upon them to sentence Martin to 151 months in prison, the top end of the applicable Guidelines range of 121-151 months.

Because the 151-month sentence was within the relevant range, a rebuttable presumption arose that the sentence was reasonable. In the absence of any evidence rebutting that presumption, Martin's sentencing challenge is without merit.

### CONCLUSION

For the reasons set out above, we AFFIRM defendant Martin's convictions and sentence. However, we conclude that the district court applied an unreasonable enhancement to defendant Blackman's base offense level for possession of a dangerous weapon, requiring that we VACATE Blackman's sentence and REMAND the case to the district court for resentencing.