RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0071p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ZACHARY JOHN KENNEDY,

*Defendant-Appellant*.

No. 21-1741

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cr-00037-1—Paul Lewis Maloney, District Judge.

Decided and Filed:  April 11, 2023

Before:  KETHLEDGE, WHITE and BUSH, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:**  Deborah A. Solove, Westerville, Ohio, for Appellant.  Stephanie M. Carowan, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

─────────────────

**AMENDED OPINION**

─────────────────

HELENE N. WHITE, Circuit Judge.  Defendant-Appellant Zachary Kennedy was sentenced to 210 months in prison after pleading guilty to a charge of conspiracy with intent to distribute various drugs.  He appeals his sentence, asserting two guideline scoring errors and a violation of the Federal Rules of Criminal Procedure.  We AFFIRM.

**I.**

Kennedy was charged with conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine, fentanyl, heroin, and crack cocaine in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841 (Count 1) and distribution of methamphetamine in violation of 21 U.S.C. § 841 (Counts 2 and 3). He pled guilty to Count 1, and the government dismissed Counts 2 and 3.

Count 1 specifically charged a conspiracy from "in or about November 2019 and continuing until in or about January 2021, in Muskegon County." R.38, PID 171. Kennedy stipulated that he "was involved in a drug trafficking conspiracy that distributed 50 grams or more of actual methamphetamine, as well as heroin, fentanyl, and crack cocaine in West Michigan." *Id.* PID 172. During the conspiracy, he "routinely purchased or otherwise obtained his drugs from a variety of co-conspirators, while at other times [he] supplied his co-conspirators with the illegal drugs that they required in order to sell to their customers." *Id.* He "frequently used cellular telephones and various social media accounts, including Facebook, to coordinate with his co-conspirators and to set up various drug deals." *Id.* "After obtaining the drugs, [Kennedy] then sold them on numerous occasions," including a sale of "approximately 99 grams of actual methamphetamine" on November 26, 2019, and another sale of "approximately 270 grams of actual methamphetamine" on December 10, 2019. *Id.* PID 172-73.

Kennedy's presentence report calculated a base offense level of 32 based on between 150 and 500 grams of at least 80% pure methamphetamine, sometimes called "ice," *see* USSG § 2D1.1(c)(4); added two levels under USSG § 2D1.1(b)(1) for firearm possession; added four levels for being a leader of five or more participants under USSG § 3B1.1(a); and deducted three levels for Kennedy's timely acceptance of responsibility. The resulting offense level was 35. The district court rejected the four-level leadership enhancement after Kennedy and the government objected to it at sentencing, the government explaining that the underlying drug trafficking was "decentralized in nature." R.61, PID 360. Consequently, the court scored a total offense level of 31. With Kennedy's category V criminal history, the Sentencing Guideline range was 168 to 210 months. The district court sentenced Kennedy to 210 months in prison.

## II.

Kennedy challenges his sentence on three bases, asserting (1) the firearm enhancement was improperly applied; (2) the district court failed to honor the read-and-discuss requirement under Federal Rule of Criminal Procedure 32(i); and (3) the Sentencing Guidelines' harsher treatment of pure methamphetamine is unfair.

## A.

We start with the firearm enhancement, to which Kennedy objected in his response to the presentencing report and at the sentencing hearing. We review the district court's application of the Sentencing Guidelines de novo and the district court's findings of fact for clear error. *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009) (citing *United States v. Hunt*, 487 F.3d 347, 350 (6th Cir. 2007)). A finding of fact is clearly erroneous when the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made. *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008).

## 1.

The Sentencing Guidelines increase a defendant's offense level for a drug-trafficking crime by two points "[i]f a dangerous weapon (including a firearm) was possessed." USSG § 2D1.1(b)(1). The Sentencing Commission's commentary on this enhancement explains that it "reflects the increased danger of violence when drug traffickers possess weapons" and "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1 cmt. n.11(A). For example, "the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet." *Id.*

We have endorsed the use of a burden-shifting framework at sentencing to determine whether the firearm enhancement applies. "Once the government establishes by a preponderance of the evidence that '(1) the defendant actually or constructively "possessed" the weapon, and (2) such possession was during the commission of the offense,' the burden shifts to the defendant to show that it was 'clearly improbable' that the weapon was connected to the offense." *United*

*States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)). "If [the defendant] fails to meet this burden, the district court should apply the enhancement." *Id.* at 606-07 (citing *United States v. Shults*, 68 F. App'x 648, 653 (6th Cir. 2003)). Several factors may be considered in this analysis, including:

> (1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) the presence of ammunition; (4) the proximity of the weapon to illicit drugs, proceeds, or paraphernalia; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking, rather than mere manufacturing or possession.

*United States v. Greeno*, 679 F.3d 510, 515 (6th Cir. 2012), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Possession must be during the offense of commission or relevant conduct, *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003), which includes "all acts and omissions committed or aided and abetted by the defendant . . . that occurred during the commission of the offense of conviction," *United States v. McDowell*, 902 F.2d 451, 454 (6th Cir. 1990) (quoting USSG § 1B1.3(a)(1)).

To support the enhancement here, the government included several exhibits with its sentencing memorandum. Five exhibits consisted of text messages sent or received by Kennedy in November and December 2020—within the span of the conspiracy. Of note, on December 21, 2020, Kennedy received a message from someone named Fresh, asking if Kennedy had any "vezzo"—a code name for methamphetamine—and Kennedy responded, "How much." R.61-2, PID 380. When Fresh asked for an ounce, Kennedy replied he did not have that but offered to put Fresh in touch with someone named Chain and mentioned another person named Crack had "some for sure." *Id.* PID 381. He further provided Fresh with Crack's asking price, which Fresh rejected. That same day, Kennedy texted someone named "Mulley," telling him to "go to my spot and get them 2 blicks and put them up plz ja will be there"—"blicks" meaning pistols and "ja" being Kennedy's girlfriend. R.61-4, PID 394. Minutes before sending that text, Kennedy texted his girlfriend, saying: "Ima send mulley by there to pick up them pistols they in the laundry room in the cabinet and it's a Pringle can in the top drawer in there throw it in the back yard." R.61-5, PID 396. The next day, Fresh asked Kennedy if he "got the mag," and Kennedy said, "I put them at mulley house." R.61-2, PID 382. Four days later, on December 26, 2020,

Kennedy asked Fresh if he took the "45" from Mulley or the "9," meaning a .45-caliber pistol versus a 9mm semiautomatic pistol. *Id.* PID 386. Fresh replied he took "Just the 9." *Id.*

In addition to the text messages, the government submitted a photograph from Kennedy's phone that appears to be a screenshot of a FaceTime conversation between Kennedy and a woman, showing Kennedy staring into the camera with a handgun pointed at the lens. It is time-stamped showing it was last modified on January 9, 2021, a date within the conspiracy.

The district court followed our two-step, burden-shifting framework at Kennedy's sentencing. First, the court found that the government had shown "by at least a preponderance of the evidence" that Kennedy possessed firearms "during the course of the conspiracy." R.67, PID 458. The court stated that Kennedy's "traffic via social media" was "fraught with many references to firearms closely connected to drug deals being perpetrated by [Kennedy]," and concluded that "the text traffic, as well as the photograph . . . established possession." *Id.* PID 457-58. Second, the district court found Kennedy did not meet his burden of showing it was "clearly improbable that his possession of the firearms was . . . connected to the drug trafficking." *Id.* PID 458. The court found Kennedy was "directing individuals, including his customers, to store, pick up, [and] transport firearms." *Id.*

We conclude that the district court did not err in applying the firearm enhancement, although we caution that the government showed the bare minimum necessary and this case rests at the outer bounds of our decisions on the firearm enhancement.

First, we find no clear error in the court's factual determination that the government proved by a preponderance of the evidence that Kennedy possessed a firearm during the commission of the conspiracy. The text conversations around December 21, 2020, establish that Kennedy had at least constructive possession of firearms at that time and that he was actively involved in the drug conspiracy at the same time. To be sure, the district court might have overstated the government's evidence when it found that Kennedy's text messages were "fraught with many references to firearms closely connected to the drug deals being perpetrated," given that Kennedy's exchange with Fresh was the only one that involved guns and drugs, and the messages around December 21, 2020 (including the conversation with Fresh) are the only

messages that show Kennedy's involvement with guns at the same time as his drug activity. *See* R.67, PID 458. But these text conversations allow for the conclusion that Kennedy possessed firearms during the commission of the drug conspiracy.

Second, we find no clear error in the court's factual determination that Kennedy failed to show it was clearly improbable that the firearms were related to the drug conspiracy. "A defendant must present evidence, not mere argument, in order to meet his or her burden." *Greeno*, 679 F.3d at 514-15. The only argument Kennedy made to support his burden was his attorney's assertion at the sentencing hearing that any gun possession "may have more to do, in fact all to do, with [Kennedy's] gang membership," and "[i]n fact, it's more probative, if you think about it, gangs have guns, it's what they do. But that doesn't mean it spills over into needing a gun or using a gun or possessing a gun in furtherance of a conspiracy to sell drugs." R.67, PID 455. Without any supporting evidence, this argument does not show it was clearly improbable that the firearms were possessed in connection with the drug conspiracy or relevant conduct, especially considering that involvement in gang activity does not make a connection to drugs less likely.

On balance, the government has made a sufficient showing on the firearm enhancement. *See Greeno*, 679 F.3d at 515. In the government's favor, unlike a hunting rifle or antique firearm, the firearms here do not have an obvious purpose unrelated to drug trafficking. *Cf.* USSG § 2D1.1 cmt. n.11(A); *United States v. Chalkias*, 971 F.2d 1206, 1216-17 (6th Cir. 1992). Also, Kennedy was engaged in drug-trafficking, not mere manufacturing or possession, and offered no evidence concerning use of the firearms unrelated to drug crimes, only his bare argument that any firearms were only related to gang activity. *See Greeno*, 679 F.3d at 515. In Kennedy's favor, the government showed nothing about the presence of ammunition or the proximity of the weapons to illicit drugs, proceeds, or paraphernalia. *See id.* And the government showed little regarding the accessibility of the firearms, except the messages about the firearms in the laundry-room cabinet, which did not show the firearms to be accessible during any of Kennedy's specifically identified drug activities. *See id.* Although the government's showing is limited in these respects, Kennedy has not overcome his failure to show a non-drug-related purpose for firearm possession beyond defense counsel's reference to gang activity.

Given the government's limited showing, we emphasize that a sentencing court must rely on more than "supposition and 'mere allegation.'" *United States v. Hatcher*, 947 F.3d 383, 396 (quoting *United States v. Blackman*, 625 F. App'x 231, 237 (6th Cir. 2015)). Indeed, in firearm-enhancement cases, we have refused to hold the burden of proof strictly against a defendant where the government's argument is highly speculative. In *Blackman*, we held there was not enough evidence to find a connection between the defendant's firearm possession and drug conspiracy where the only evidence of firearm possession was a photograph of the defendant with a firearm taken shortly before the defendant traveled for the conspiracy. 625 F. App'x at 235-37. Although Blackman "did not offer evidence of his legitimate, innocent possession of the firearm in the . . . photo," it was "[e]qually true . . . that the government offered absolutely no evidence to the contrary." *Id.* at 237. However, unlike in *Blackman*—in which there was no evidence of drug possession, sales, or any other drug activity on the date of the photograph—the government showed that Kennedy both possessed guns and engaged in drug-trafficking activities on the same date. *See id.*

**2.**

Kennedy challenges the district court's reasoning on several bases, none of which convince us that the district court committed clear error in finding firearm possession. First, he points to the fundamental absence of a weapon, arguing that "[n]o particular weapon was identified by the PSR"; "[t]here was also no contention by the government that one was ever seen with Mr. Kennedy during a drug transaction or at any other time during relevant conduct"; "[n]or was one seized from him or at a location or vehicle associated with him at any time"; and "[n]o one testified on this enhancement at the sentencing hearing and no affidavits were presented by either party." Appellant's Br. at 5-6. However, these arguments overlook both the picture of Kennedy holding a firearm and the texts showing Kennedy's constructive possession of firearms.

Kennedy next contends that the photo of him with a gun was "obviously modified," and notes that the "only information the government included about the photo is the date it was modified." *Id.* at 11. He underscores the need for evidence at sentencing to have "sufficient indicia of reliability to support its probable accuracy" and flags that the government has shown

when the image was modified, not created. Appellant's Reply Br. at 2 (quoting USSG § 6A1.3 (Policy Statement)). He cites *Blackman*, discussed above, in which we found the government did not carry its burden to show firearm possession based on a single photograph of the defendant with a firearm. 625 F. App'x at 235-37.

This argument fails to persuade as well. To begin, Kennedy did not object to the photo at sentencing; rather, counsel acknowledged "a photograph of my client holding a gun" and that it was likely Kennedy's own photograph. R.67, PID 454. As for reliability, the district court fairly relied on the government's representations of having obtained the photograph from Kennedy's phone. The "obvious[]" modifications Kennedy suggests are that the image has been fit diagonally within a black border, and a separate image of a woman appears in the upper left-hand corner. *See* Appellant's Br. at 11. But any format changes do not suggest the image was fabricated, and the image of a woman seems simply to be part of a FaceTime call or other digital communication. Turning to *Blackman*, that decision is informative but not determinative. In *Blackman*, which was unpublished, the only link between the defendant and firearm possession was the photograph, which was taken days before the defendant traveled to participate in the conspiracy and before the photographs of drugs found on his phone were taken. *Blackman*, 625 F. App'x at 235-37. Here, the photograph—albeit without indication of when it was created—was produced alongside numerous text messages discussing firearms, including conversations that show constructive possession at the same time as drug-trafficking activities.

Third, Kennedy argues the government did not show enough to rely on a "reasonable foreseeability" argument. The firearm enhancement can be applied to a defendant if a firearm is possessed by a co-conspirator because USSG §1B1.3(a)(1)(B) allows the sentencing court to consider "in the case of a jointly undertaken criminal activity[,] . . . all acts and omissions of others" that were "reasonably foreseeable in connection with that criminal activity." USSG §1B1.3(a)(1)(B). "[A]t a minimum, we require that there be objective evidence that the defendant knew the weapon was present, or at least knew it was reasonably probable that his co-conspirator would be armed." *See United States v. Cochran*, 14 F.3d 1128, 1132-33 (6th Cir. 1994). Kennedy's presentence report suggested the firearm enhancement could be applied based on this theory, and the government raised it at sentencing. However, although the district court

in its enhancement analysis mentioned that Kennedy's "co-conspirators were found with firearms," it does not appear that the court relied on this alternative theory of possession.  R.67, PID 458.  The court made no mention of reasonable foreseeability, and the text messages and photo were the court's clear focus in applying the enhancement.  Thus, the government's theory of reasonable foreseeability is beside the point.

Fourth, Kennedy argues the district court made errors of law because it "erroneously combined constructive possession and reasonably foreseeable possession by others into a 'totality of the circumstances' determination," and further "it required Kennedy to show that it was clearly improbable that the (unidentified) guns, even though not present, were connected to relevant conduct."  Appellant's Br. at 24.  As to the first point, again, though the district court's reference to Kennedy's co-conspirators is ambiguous, the court did not engage in a reasonably foreseeable analysis, and the totality-of-the-circumstances determination considered text messages concerning firearms, which were properly part of the court's decision to apply the firearm enhancement.  As to the second point, there were guns identified—the gun in the photograph and the guns discussed in the text exchanges—that Kennedy could have shown had a purpose unrelated to drugs.  Indeed, Kennedy's attorney argued at sentencing that the guns "may have more to do, in fact all to do, with [Kennedy's] gang membership."  R.67, PID 455.  He simply failed to support the argument with evidence.

Fifth, Kennedy argues that the "government never claims specifically which facts support a finding of actual possession and which support a finding of constructive possession of a weapon despite the fact that these two states of possession are mutually exclusive."  Appellant's Reply Br. at 1 (citing *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998)).  But the government specifically cites in its brief the text exchanges among Kennedy, his girlfriend, and Mulley as evidence of constructive possession, and the government presumably considers the photograph of Kennedy with a handgun to be evidence of actual possession.  Moreover, while constructive possession and actual possession may be mutually exclusive, there is no reason the government could not show that Kennedy had constructive and actual possession of firearms at different points over the course of the conspiracy.

Sixth, Kennedy makes a broad-sweeping argument based on statutory-interpretation principles to suggest that the Sixth Circuit's burden-shifting scheme—at least as applied by the district court here—gives insufficient meaning to the word "present," rendering it synonymous with "possessed." As outlined above, the firearm enhancement applies "[i]f a dangerous weapon . . . was possessed," USSG § 2D1.1(b)(1), and "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected to the offense," *id.* § 2D1.1 cmt. n.11(A). And under our burden-shifting framework, once "the government establishes by a preponderance of the evidence that '(1) the defendant actually or constructively "possessed" the weapon, and (2) such possession was during the commission of the offense,' the burden shifts to the defendant to show that it was 'clearly improbable' that the weapon was connected to the offense [or relevant conduct]." *Catalan*, 499 F.3d at 606 (quoting *Hill*, 79 F.3d at 1485).

Kennedy rightly emphasizes the word "present"; even so, the government met its burden here. Our burden-shifting scheme accounts for the word "present" by requiring that the government show both that the defendant possessed a firearm and that he did so during the commission of the offense. As Kennedy notes, in *United States v. Sanchez*, we explained that these two requirements usually "collapse into a single factual determination because the weapon was present when the arrest took place or where the crime was committed," and "[i]n these instances, once the government proves a defendant was in possession of a weapon, its burden is satisfied." 928 F.2d 1450, 1460 (6th Cir. 1991). However, these requirements remain distinct where, as here, no weapon was found on the defendant or where the crime was committed.

Determining whether a firearm was present during the commission of the offense or relevant conduct within the meaning of USSG § 2D1.1 is more complicated in the context of a long-running conspiracy. We have found that the mere possession of a firearm during the span of a conspiracy is enough for the government to prove possession and shift the burden to the defendant. *See United States v. Lucas*, 529 F. App'x 463, 466 (6th Cir. 2013); *United States v. Benson*, 591 F.3d 491, 504 (6th Cir. 2010); *United States v. Milan*, 218 F. App'x 492, 495 (6th Cir. 2007). But in *Benson*, the only published decision of these cases, the defendant did not contest that he possessed a firearm during the commission of the offense; he only contested whether the firearm was "clearly connected to" the conspiracy. 591 F.3d at 504. And in both

*Benson* and *Milan*, there was evidence of firearms at locations where the defendant participated in drug-trafficking activities. *Id.* (Benson acknowledged handguns found at his apartment, which he used for drug-trafficking activity); *Milan*, 218 F. App'x at 495-96 (Milan did not dispute that, during the conspiracy, he possessed a firearm at his home, where "drugs were stored and drug transactions took place"). *Lucas*, an unpublished decision, goes the furthest, finding the firearm enhancement applicable based on a single proven instance of possession during the conspiracy at a location with no ties to the conspiracy and on a date with no proven instances of drug sales. *See* 529 F. App'x at 464-65. The opinion provides no analysis of whether the firearm was present and seems to equate "present" with "possession." In *Lucas*,[1] we cited *Benson* and *Milan* as authority for our decision. *Id.* at 466. But as discussed, neither of these cases involved possession of a firearm with no discernible nexus to the conspiracy or relevant conduct. *See* 591 F.3d at 504; 218 F. App'x at 495-96. Further, although Lucas asserted that his wife had given him the firearm, the district court noted that he presented no testimony to support this assertion and that Lucas's wife was involved in the conspiracy. 529 F. App'x at 465.

In other instances, we have conducted a more searching inquiry of whether a firearm was possessed during the commission of a conspiracy. For example, in *United States v. Dunlap*, the defendant argued that the government had not shown enough because it "failed to prove that he possessed [a] weapon during a narcotics transgression." 209 F.3d 472, 476 (6th Cir. 2000), *abrogated in part on other grounds as recognized in United States v. Camacho-Arellano*, 614 F.3d 244, 250 (6th Cir. 2010). Rather than simply finding that possession during the conspiracy was enough, we found that the government met its burden because the defendant weighed crack cocaine in front of an informant to whom he sold a firearm, which he did for the "manifest purpose of (1) notifying the [informant] that those illegal stimulants were available for purchase, and/or (2) preparing them for street distribution." *Id.* In *United States v. Tisdale*, we explained that "[p]ossession 'during the commission of the offense' may be found if the firearm 'could have facilitated [the] illegal [drug] transactions,'" and we held the government made this showing because the defendant "had dominion and control over the pistol found in the apartment that served as the headquarters of the defendants' drug operations." 952 F.2d 934, 937 (6th Cir.

---

[1]Judge White acknowledges that she was a panel member in *Lucas*.

1992) (first alteration added) (quoting *United States v. Snyder*, 913 F.2d 300, 304 (6th Cir. 1990), *cert. denied*, 498 U.S. 1039 (1991)); *see also United States v. Foster*, 832 F. App'x 401, 404 (6th Cir. 2020) (finding the "undisputed facts were . . . sufficient to infer that defendant's possession was during the commission of the offense," because "[a]long with the firearm, officers discovered over 57 grams of methamphetamine and a scale with methamphetamine residue on it in defendant's car"). Similarly, in *United States v. Bish*, we applied our traditional factors for applying the firearm enhancement to this question before shifting the burden to defendant. 835 F. App'x 858, 861-63 (6th Cir. 2020).

Given the lack of clarity on this issue and the need to give meaning to the word "present," we now make clear that, in the context of a long-running drug-trafficking conspiracy, the government needs to show some nexus between the demonstrated firearm possession—actual or constructive—and the defendant's activities in pursuit of the conspiracy; possession cannot simply be possession at any point during the conspiracy, without regard to any nexus. Here, the government showed a sufficient nexus for the district court to find that Kennedy possessed a firearm during the commission of the conspiracy to distribute and possess with intent to distribute controlled substances, including methamphetamine. The government showed Kennedy constructively possessed firearms on December 21, 2020, and on the same day, he exchanged text messages in which he discussed potentially selling methamphetamine. We note, however, that had the text messages discussing a potential drug sale with Fresh not been provided to the court, the government would have failed to establish the requisite nexus. With the text messages, the government showed enough, albeit barely, to establish that the firearms Kennedy constructively possessed were "present" during the commission of the drug conspiracy, and therefore the burden properly shifted to Kennedy.

**B.**

Kennedy also argues that the district court erred by failing to comply with Federal Rule of Criminal Procedure 32(i), which requires that a sentencing court "verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report[.]" Kennedy admits he did not raise this objection at the sentencing hearing but argues a letter he sent to the court before sentencing did make this objection. Kennedy wrote

two letters to the court.  In one, he complained that he had not seen the final presentence report as of five days before the sentencing.  Because it was established at sentencing that Kennedy later met with his attorney with at least some opportunity to review the final sentence report—discussed more below—and Kennedy agreed that he wished to withdraw all assertions in the letter, his objection was not preserved.  Thus, we review for plain error.

Plain-error review has four components.  "First, there must be an error or defect—some sort of 'deviation from a legal rule'—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived by the appellant."  *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).  "Second, the legal error must be clear or obvious, rather than subject to reasonable dispute."  *Id.* (quoting *Puckett*, 556 U.S. at 135).  "Third, the error must have affected the appellant's substantial rights," a requirement that typically means the error "affected the outcome of the district court proceedings."  *Id.* (quoting *Puckett*, 556 U.S. at 135).  Fourth, assuming these criteria are met, "the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  *Id.* (quoting *Puckett*, 556 U.S. at 135).

Failure to comply with Rule 32(i) requires a remand for resentencing.  *United States v. Mitchell*, 243 F.3d 953, 955 (6th Cir. 2001).  "The literal compliance requirement 'helps to ensure that defendants are sentenced on the basis of accurate information and provides a clear record for appellate courts, prison officials, and administrative agencies who may later be involved in the case.'"  *Id.* (quoting *United States v. Tackett*, 113 F.3d 603, 613-14 (6th Cir. 1997)).  However, the "district court need not make an affirmative inquiry, so long as it can somehow determine that defendant and counsel have read and discussed the report."  *Id.*  Of course, we still "urge district courts to discourage non-meritorious appeals by simply making such an inquiry a regular part of the sentence hearing."  *Id.*

Kennedy contends that it is unclear on this record whether the district court satisfied Rule 32(i) because the court did not explicitly ask him if he "read and discussed" the presentence report with counsel.  He also contends there is confusion in the record because although counsel said that three days before the sentencing hearing he brought everything he had to the jail for

Kennedy to read, and returned after to meet, he did not specify that he brought the final presentence report or what occurred when they met.

*Mitchell* makes clear that so long as the district court can determine that defendant and counsel had the requisite discussion, Rule 32(i) is satisfied. This is the case here. *See* 243 F.3d at 955. After finishing the discussion of Kennedy's letter, the district court mentioned Guidelines scoring for the final presentence report and asked Kennedy's counsel: "Mr. Mitchell, based on your recent meetings with the defendant, I take it you've had ample opportunity of reviewing the report with your client?" Counsel answered: "Yes, your Honor." The court then said to Kennedy: "And Mr. Kennedy, you agree with that; is that correct?" Kennedy replied: "Yes, sir." Kennedy's assertion on appeal that this question was "intimidating" and leading is baseless. *See* Appellant's Br. at 45. Before this exchange, the court engaged in a lengthy, open-ended discussion with Kennedy about the concerns addressed in his letters. The court made clear that if Kennedy felt anything counsel said was inaccurate, he could speak up and the court would want to know what he had to say. Additionally, Kennedy's questions to the court about the scoring reflected familiarity with the report, and counsel discussed delivering materials to Kennedy after the final presentence report became available and returning to meet with him before sentencing, all of which suggests they engaged in the requisite reading and discussion. Accordingly, we find no error, plain or otherwise.

### C.

Lastly, Kennedy argues the trial court erred when it calculated his base offense level based on the Guidelines distinction between pure methamphetamine and methamphetamine mixtures. Crimes involving pure methamphetamine trigger a ten-year mandatory penalty at 50 grams, while crimes involving a methamphetamine mixture trigger a ten-year mandatory penalty at 500 grams. 21 U.S.C. § 841(b)(1)(A)(viii). The Sentencing Guidelines reflect this statutory disparity. *See* USSG § 2D1.1(c), Notes to Drug Quantity Table (B)-(C) (defining "Methamphetamine (actual)" as the actual weight of methamphetamine in a mixture and "Ice" as a methamphetamine mixture with at least 80% purity); *id.* § 2D1.1(c) (setting sentencing triggers for methamphetamine (actual) and ice as equivalent to sentencing triggers for ten times greater quantity of methamphetamine mixture). A number of district courts have found the disparity to

be a policy reason not to follow the Guidelines in cases involving pure methamphetamine. *See United States v. Johnson*, 812 F. App'x 329, 334 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 430 (2020). However, although a district court *may* take this policy disagreement into consideration, it is within the court's discretion not to do so. *See United States v. Brooks*, 628 F.3d 791, 799‑800 (6th Cir. 2011); *Johnson*, 812 F. App'x at 334. Kennedy acknowledges this discretion, and explains he merely includes the argument to preserve the objection for anticipated future changes to the Guidelines for methamphetamine.

**III.**

For the reasons stated, we AFFIRM.