RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

    *v.*

MARLON JERMAINE JOHNSON,

                *Defendant-Appellant*.

No. 22-6048

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:18-cr-00065-1—Claria Horn Boom, District Judge.

Decided and Filed:  March 5, 2024

Before: SILER, MATHIS, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Patrick F. Nash, NASH MARSHALL, PLLC, Lexington, Kentucky, for Appellant. Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, Andrew H. Trimble, UNITED STATES ATTORNEY'S OFFICE, London, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

MATHIS, Circuit Judge.  After a jury convicted Marlon Johnson of firearm and drug-trafficking offenses, the district court sentenced him to 300 months' imprisonment.  Johnson raises constitutional, statutory, and evidentiary challenges to his convictions.  Johnson also argues that his sentence is substantively unreasonable.  For the following reasons, we affirm.

**I.**

In November 2018, an informant advised a deputy sheriff working for the Knox County Sheriff's Department ("KCSD") about nearby drug activity.  According to that informant, a black male named "Jake" was at a residence in Corbin, Kentucky, with a large quantity of methamphetamine.  Based on this information, the KCSD obtained a search warrant and surveilled the residence.  During the surveillance, officers observed a Toyota Corolla nearby.

After the surveillance and prior to executing the search warrant, KCSD officers met at a nearby restaurant parking lot.  Officers observed the same Toyota enter the lot, turn into the restaurant's drive-through area, and exit by circling back behind the business.  A KCSD officer followed the Toyota in his cruiser and saw that the driver was not wearing a seatbelt.  The officer activated his cruiser's lights and sirens.  Then, the Toyota sped away, crashed into a fence, and struck another vehicle.  Upon identifying Johnson as the driver, officers arrested him and searched the vehicle.  During the search, officers uncovered 1,222.21 grams of methamphetamine—over 1,000 grams of that amount was pure—along with a loaded semiautomatic pistol.

A grand jury indicted Johnson for possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), possessing a firearm in furtherance of a prosecutable drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  Johnson proceeded to trial.  After the first trial concluded in a mistrial, the second trial resulted in guilty verdicts on all counts.  The district court sentenced Johnson to 300 months' imprisonment.  This timely appeal followed.

**II.**

Johnson challenges his convictions and sentence on four grounds: (1) the jury venire was not drawn from a fair cross section of the community, in violation of the Sixth Amendment and the Jury Selection and Services Act ("JSSA"), 28 U.S.C. § 1867 *et seq.*; (2) his felon-in-possession conviction violates the Second Amendment; (3) the district court erred in admitting

the testimony of a government witness; and (4) his sentence is substantively unreasonable.  We address each argument in turn.

## A.  Sixth Amendment and JSSA Claim

The U.S. Constitution's Sixth Amendment guarantees a criminal defendant the right to a trial "by an impartial jury."  U.S. Const. amend. VI.  An "essential component" of this guarantee is the requirement that courts select all grand and petit juries at random from a fair cross section of the community in the judicial district or division where the court convenes.  *Taylor v. Louisiana*, 419 U.S. 522, 528–29 (1975); *United States v. Ovalle*, 136 F.3d 1092, 1106 (6th Cir. 1998).  This requirement focuses only on the "procedure for selecting juries, and not the outcome of that process."  *Ambrose v. Booker*, 684 F.3d 638, 645 (6th Cir. 2012).  The Sixth Amendment does not impose a "requirement that petit juries actually chosen must mirror the community." *Taylor*, 419 U.S. at 538; *see Ambrose*, 684 F.3d at 645 ("The Sixth Amendment guarantees only the opportunity for a representative jury, not a representative jury itself." (citation omitted)).

To establish a prima facie case for a fair-cross-section claim, a defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).  Once satisfied, the burden shifts to the government, which "bears the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest."  *Id.* at 368.  We use the same analysis for JSSA claims.  *Ovalle*, 136 F.3d at 1099; *United States v. Allen*, 160 F.3d 1096, 1102 (6th Cir. 1998) (explaining that the test for JSSA liability is "essentially identical to the *Duren* . . . test used in the Sixth Amendment fair-cross-section analysis").  Whether a violation under the Sixth Amendment or JSSA has occurred is a mixed question of law and fact, which we review de novo.  *Allen*, 160 F.3d at 1101.

**1.**

The Eastern District of Kentucky ("EDKY") promulgated its most recent Plan for the Random Selection and Qualification of Grand and Petit Jurors on June 29, 2018. *See* Plan for the Random Selection and Qualification for Grand Petit Jurors (E.D.K.Y. 2018) (the "Jury Selection Plan").[1] The Jury Selection Plan states that "[i]t is the policy of [the EDKY] that all persons and entities entitled to consideration by a jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in the jury division of the district wherein the court convenes," and that "[n]o citizen shall be excluded . . . on account of race, color, religion, sex, national origin or economic status." *Id.* §§ 1.1, 2.1.

The Jury Selection Plan uses a funnel-like system to ensure a fair cross section of the community is selected. This begins with the random selection of individuals across the EDKY, using voter registration lists for each of the EDKY's counties. *Id.* §§ 4.1, 5.1–5.2. The names selected are placed in both the Master Wheel of EDKY, along with the Master Jury Wheel of their respective judicial division.[2] *See id.* §§ 4.1, 5.1–5.2, 6.1–6.2. From the Master Jury Wheel, names are (again) randomly selected to determine whether each person is eligible for placement in their respective division's Qualified Jury Wheel. *Id.* §§ 10.2, 13.1. To qualify for placement, an individual must be: (1) a United States citizen who is at least eighteen years of age and has resided for at least one year in the EDKY; (2) proficient in the English language; and (3) mentally and physically capable of serving as a juror. *Id.* § 8.3(1)–(4). A felony conviction or a pending felony charge disqualifies a person from jury service. *Id.* § 8.3(5).

For the Qualified Jury Wheel, the EDKY obtains eligibility information by delivering questionnaires to potential jurors, which are prepared and executed to conform with 28 U.S.C. § 1864. *Id.* §§ 12.1–12.2. Once a district court determines that it needs to empanel a petit jury, the district court directs the clerk of court to draw enough names to meet the needs of the case. *Id.* § 10.2. The clerk draws those names from the Qualified Jury Wheel of the jury division in

---

[1]The Jury Selection Plan can be accessed at: https://www.kyed.uscourts.gov /sites/kyed/files/Jury_Plan_FILED.pdf.

[2]The EDKY's London Division includes the counties of Bell, Clay, Harlan, Jackson, Knox, Laurel, Leslie, McCreary, Owsley, Perry, Pulaski, Rockcastle, Wayne, and Whitley. Jury Selection Plan § 6.2.

which the petit jury is empaneled. *Id.* If an insufficient number of jurors are selected, the clerk calls additional names until the court reaches a sufficient number of potential jurors. *Id.*

Johnson's first trial began in May 2021. After the jury-selection process failed to summon a single African American juror, Johnson objected. The district court overruled his objection. After that, the jury deadlocked, necessitating a new trial.

Before his second trial, and at Johnson's request, the district court approved the hiring of a jury pool consultant. This consultant requested trial jury data from the EDKY and analyzed those data. Based on the consultant's analysis, Johnson filed a "Motion for a Jury Drawn from a Representative and Fair Cross-Section of the Community or, in the Alternative, Motion to Dismiss." The motion asserted that the London Division's Qualified Jury Wheel "underrepresents black people" at a "statistically significant" rate. R. 352, PageID 2772. More specifically, Johnson claimed that the consultant's comparative disparity analysis showed that "there is as much as a 57.28% under representation of African Americans in the current London Division" Qualified Jury Wheel, and that more than 50% "of the black jurors expected to be in the current" wheel was missing. *Id.* at 2772–73 (emphasis omitted). Johnson contends that the underrepresentation was "not limited to the current London Division;" it also existed at the time of the 2017 and 2019 wheels. *Id.* at 2774.

The district court denied Johnson's motion. It found that Johnson failed to satisfy the third prong of the *Duren* test because (i) "long-standing statistical disparity is not enough to establish systematic exclusion"; and (ii) Johnson failed to point to any other viable source of exclusion in the EDKY's jury-selection procedures. R. 373, PageID 2908–16. The parties did not dispute the first *Duren* prong, and the district court opted not to resolve the second prong. Once the second trial commenced, the jury wheel yet again produced no African American jurors. Johnson renewed his motion and the district court, sticking with its prior decision, denied it.

**2.**

On appeal, the parties focus their arguments on the third *Duren* prong, and so will we. Johnson makes two main arguments on appeal. First, he maintains that his statistical analysis—

comparative disparity and standard deviation—establishes the per se existence of a systematic exclusion of African Americans in the London Division.  Second, and in the alternative, Johnson argues that several procedures that the EDKY used systematically exclude African Americans from jury pools.  For the following reasons, we reject Johnson's arguments.

**a.**

A challenged disparity is considered a "systematic exclusion" if it is "inherent" to the jury-selection process.  *Allen*, 160 F.3d at 1104.  This ordinarily requires the defendant to show either a large routine discrepancy or identify a specific procedural or operational flaw linked to the underrepresentation of the distinctive group in the jury venire.  *See Duren*, 439 U.S. at 366–67.  For example, in *Duren*, the Supreme Court found that the low percentage of women available at the final venire stage of jury selection (around 15%) satisfied the third prong and that the defendant's evidence linking fewer women jurors with Missouri's practice of automatically exempting from jury service any women who requested not to serve also led to this conclusion. *Id.*  And in *Garcia-Dorantes v. Warren*, we concluded that "a computer glitch in the Kent County software that [] systematically excluded African-Americans from the jury pool from April 2001 through early 2002" satisfied the third prong.  801 F.3d 584, 587, 603 (6th Cir. 2015).

Johnson has not identified a procedural or operational flaw in the Jury Selection Plan that could satisfy the third *Duren* prong.  To begin, nonextreme statistical disparities, standing alone, are ordinarily insufficient to satisfy this requirement.  *See Bates v. United States*, 473 F. App'x 446, 450 (6th Cir. 2012).  However, a routinely "large discrepancy" may "manifestly indicate[] that the cause of the underrepresentation was systematic—that is, inherent in the particular jury selection process utilized."  *Duren*, 439 U.S. at 366; *Bates*, 473 F. App'x at 450 ("Indeed, an extreme underrepresentation may be enough to establish a *per se* systematic exclusion."); *Smith v. Berghuis*, 543 F.3d 326, 340 (6th Cir. 2008) ("While this disparity may not rise to the level of demonstrating systematic exclusion *per se*, this persistent disparity combined with Petitioner's evidence . . . was sufficient."), *rev'd on other grounds*, 559 U.S. 314 (2010).  But because the size of the distinctive group, relative to the jury-eligible population, is too small to produce a trustworthy comparative disparity, we are hesitant to find a per se systematic exclusion here.

The comparative disparity calculation can help courts measure a distinctive group's underrepresentation in a jury venire. "Comparative disparity measures the decreased likelihood that members of an underrepresented group will be called for jury service, in contrast to what their presence in the community suggests it should be." *Garcia-Dorantes*, 801 F.3d at 601 (quoting *United States v. Shinault*, 147 F.3d 1266, 1272 (10th Cir. 1998))

Establishing comparative disparity requires some math. To determine comparative disparity, one must divide the absolute disparity of the distinctive group "by that group's percentage in the general population." *Id.* Absolute disparity is the difference between a distinctive group's percentage in the general population and that group's percentage in the qualified jury wheel. *Id.* at 600–01. Although comparative disparity is a "more appropriate measure of underrepresentation" when the overall population of a distinctive group is small, *id.* (quoting *Smith*, 543 F.3d at 338), it can still lead to misleading results where, as here, the distinctive group is also only a small percentage of the community's jury-eligible population, *Smith*, 543 F.3d at 338–39. *See Shinault*, 147 F.3d at 1273 ("[T]he smaller the group is, the more the comparative disparity figure distorts the proportional representation." (alteration in original) (quoting *United States v. Hafen*, 726 F.2d 21, 24 (1st Cir. 1984))).

The EDKY's 2021 Master Wheel consisted of 40,020 names, 1,999 of which were randomly selected for potential placement in the London Division's Qualified Jury Wheel. The London Division delivered the same number of jury qualification forms. Of the forms mailed out, 1,356 were completed and returned and 233 were declared undeliverable. Twelve (0.88%) of the forms returned came from individuals who identified as "Black or African American." However, 195 individuals (14.38%) failed to indicate their race. When these "unknowns" were removed, the percentage of African Americans in the London Division's Master Jury Wheel rose to a mere 1.03%.

To compile the Qualified Jury Wheel, the London Division removed 810 names because those individuals were either ineligible or excused from serving. Three of the 810 individuals removed, or 0.37%, identified as "Black or African American." After accounting for those removals, 779 names remained in the Qualified Jury Wheel. Only nine (1.16%) were "Black or African American." According to the EDKY's AO-12 form, 1.7% of the London Division's

citizen population is African American.[3]  Thus, using Johnson's data, the London Division's comparative disparity is 32%—a number that probably satisfies the second *Duren* prong.  *See Smith*, 543 F.3d at 338 (finding a 34% comparative disparity sufficient to satisfy the second prong).

Nevertheless, with a distinctive group so miniscule, even a small change in the group's share of the qualified jury pool would distort the comparative disparity analysis.  For example, if we increase the total number of African Americans in the jury-eligible population from nine to eleven, their share of the Qualified Jury Wheel increases to only 1.4%.  But with that figure, the comparative disparity in the London Division plummets from 32% to 17.6%.  For this reason, several courts have rejected the usefulness of comparative disparity where, as here, the distinctive group's share of the jury-eligible population is so small.  *See United States v. Weaver*, 267 F.3d 231, 243 (3d Cir. 2001) ("Looking first at the comparative disparity figures, we find that they are quite high—40.01% and 72.98%—but that [is] because African-Americans and Hispanics comprise such a small percentage of the population, the results of this analysis are of questionable probative value."); *Shinault*, 147 F.3d at 1273 (finding comparative disparities of 48%, 50%, and almost 60% to be "distorted by the small population of the different minority groups").  We do the same.  Comparative disparity cannot, by itself, establish the third *Duren* prong when the size of the distinctive group comprises only 1.16% of the jury-eligible population.

Seemingly recognizing the weaknesses of his comparative disparity analysis, Johnson pivots to a standard deviation analysis that he claims shows the existence of systematic exclusion.  Standard deviation measures "the predicted fluctuations from the expected value." *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977).  The problem for Johnson is that he points

---

[3]An AO-12 form

provides the following information on the current, non-emptied master jury wheel used by the Division: (1) general information about the master wheel, including identification of the source data and number of names placed in the wheel; (2) data related [to] the sampling of returned questionnaires, including [the] number of forms mailed, returned, returned undeliverable and demographic data concerning the race, ethnicity, and sex of those individuals returning forms; (3) data related to the sampling of the qualified jury wheel including relevant demographic data of the qualified wheel; and (4) a comparison of the jury wheel sample against the population of the jury division.

to evidence that compares apples and oranges. The jury consultant calculated the standard deviation for the comparison between the jury-eligible percentage of African Americans in the EDKY and the percentage of African Americans in the London Division Qualified Jury Wheel. Depending on the year, the comparison ranged from four to six standard deviations below the expected value. Although the data are interesting because they may show a concentration of qualified African Americans outside of the London Division, they do not show a systematic underrepresentation in the London Division's jury-selection process. The relevant community is the division, and not the district. As we have previously held, the drawing of a jury from a fair cross section of the community in *either* a district or a division in which the court convenes, as the JSSA commands, passes constitutional muster. *United States v. Davis*, 27 F. App'x 592, 597 (6th Cir. 2001).

**b.**

As an alternative to his statistical arguments, Johnson points to the following EDKY procedures which he contends showed the existence of systematic exclusion of African Americans in the EDKY: (i) the exclusive use of voter registration lists as the starting point for the jury-selection process; (ii) the disqualification of all potential jurors who have a felony conviction; and (iii) the removal of potential jurors who did not respond to jury questionnaires or otherwise had their questionnaires declared undeliverable. However, none of these arguments persuades us.

*First*, this court and other circuits have found that the use of voter registration lists as the exclusive source of jury venire members does not generally constitute systematic exclusion under *Duren*'s third prong. *See, e.g.*, *United States v. Wagoner*, 836 F. App'x 374, 381 (6th Cir. 2020) (finding "no systematic failure" where the petit jury was "selected by randomly draw[ing names] from the voter rolls" (alteration in original) (internal quotation marks omitted)); *United States v. Carmichael*, 560 F.3d 1270, 1279 (11th Cir. 2009); *United States v. Gonzalez-Velez*, 466 F.3d 27, 39 (1st Cir. 2006); *United States v. Morin*, 338 F.3d 838, 844 (8th Cir. 2003); *United States v. Smallwood*, 188 F.3d 905, 914–15 (7th Cir. 1999). And Johnson points to nothing to suggest systematic underrepresentation in the voter registration lists or an operational

flaw in EDKY's use of these lists that may have caused an underrepresentation of African Americans.

*Second*, the disqualification of felons from the Qualified Jury Wheel is not "inherent" to the EDKY's Jury Selection Plan; rather, federal law requires it.  28 U.S.C. § 1865(b)(5) (mandating the disqualification of any individual from serving on a federal grand or petit jury who "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.").  And Johnson does not provide any evidence linking the exclusion of African American jurors from the qualified jury pool because of the felon disqualification rule beyond mere speculation.

*Third*, the removal of unresponsive jurors from the Qualified Jury Wheel is not an act of systematic exclusion.  Nonresponses that are "the result of individual choice" are not a problem "inherent" to EDKY's Jury Selection Plan.  *Bates*, 473 F. App'x at 451 (citing *United States v. Cecil*, 836 F.2d 1431, 1447 (4th Cir. 1988)).  Here, Johnson put forth no evidence to suggest that potential African American jurors face unique obstacles that prevent them from receiving or returning the questionnaire.  And to the extent that Johnson argues that the exclusion of jurors with undeliverable questionnaires produce an unrepresentative cross section, he points to nothing that shows that these jurors were disproportionately African American.

## B.  Second Amendment Claim

Next, Johnson raises a challenge to his felon-in-possession conviction under the Second Amendment based on *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).  Johnson specifically argues that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him.  But as Johnson acknowledges, he did not raise this challenge before the district court.  Thus, we review it for plain error.  *See Greer v. United States*, 593 U.S. 503, 507 (2021) ("If the defendant has 'an opportunity to object' and fails to do so, he forfeits the claim of error.  If the defendant later raises the forfeited claim on appeal, [the] plain-error standard applies." (quoting Fed. R. Crim. P. 51(b))).  Under plain-error review, a defendant must establish: (1) an error, (2) that was "plain,"

(3) that affected "substantial rights," and (4) that seriously impacted "the fairness, integrity or public reputation of judicial proceedings." *Id.* at 507–08 (citations omitted).

Johnson has failed to show that the district court committed plain error. An error is "plain" if it is "clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009). In situations "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is enough that the error be 'plain' at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 468 (1997); *see United States v. White*, 58 F.4th 889, 894 (6th Cir. 2023) ("[P]lain-error review applies '[e]ven where a new rule of law is at issue.'" (quoting *Henderson v. United States*, 568 U.S. 266, 272 (2013))). Reversal is mandated only in "exceptional circumstances." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (quoting *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994)).

After *Bruen*, we have not addressed the constitutionality of § 922(g)(1), *United States v. Bowers*, No. 22-6095, 2024 WL 366247, at *3 (6th Cir. Jan. 31, 2024), but some of our sister circuits have. A circuit split exists regarding the constitutionality of felon-in-possession convictions. The Eighth Circuit held that felon-in-possession convictions do not violate the Second Amendment, opining that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons." *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023). Around that same time, the Third Circuit sustained an as-applied challenge to § 922(g)(1) for a prospective gun owner who had a prior state conviction for making a false statement to obtain federal food stamps. *Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc). As we have previously explained, "[a] circuit split precludes a finding of plain error, for the split is good evidence that the issue is subject to reasonable dispute." *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) (quotation omitted).

This court and our sister circuits have also rejected Second Amendment challenges to § 922(g)(1) under plain-error review. *See Bowers*, 2024 WL 366247, at *3; *United States v. EtchisonBrown*, No. 22-10892, 2023 WL 7381451, at *3 (5th Cir. Nov. 7, 2023) (per curiam) ("Because the constitutionality of § 922(g)(1) after *Bruen* is far from settled and there is no controlling authority, the district court's application of § 922(g)(1) to EtchisonBrown was not plain error."); *United States v. Racliff*, No. 22-10409, 2023 WL 5972049, at *1 (5th Cir. Sept. 14,

2023) (per curiam) ("Because there is no binding precedent explicitly holding that § 922(g)(1) is unconstitutional and because it is not clear that *Bruen* dictates such a result, Racliff is unable to demonstrate an error that is clear or obvious."); *United States v. Garza*, No. 22-51021, 2023 WL 4044442, at *1 (5th Cir. June 15, 2023) (per curiam) ("Because there is no binding precedent explicitly holding that § 922(g)(1) is unconstitutional on its face or as applied and because it is not clear that either *Bruen* or [*United States v.*] *Rahimi*[, 61 F.4th 443 (5th Cir. 2023)] dictate such a result, Garza is unable to demonstrate an error that is clear or obvious."); *United States v. Hill*, No. 22-2400, 2023 WL 2810289, at *2 (7th Cir. Apr. 6, 2023) (order) ("[A]fter *Bruen*, no appellate court has held that § 922(g)(1) violates the Second Amendment . . . .  Because the law is unsettled, any error, if there was one, would not be plain.").

Without precedent explicitly holding that § 922(g)(1) is unconstitutional and because it is unclear that *Bruen* dictates such a result, we find that Johnson has not satisfied the plain-error standard.

## C. *Res Gestae* Evidence

Generally speaking, Federal Rule of Evidence 404(b) prohibits the admission of evidence of a criminal defendant's prior bad acts unless it is introduced for an acceptable purpose. However, background evidence, often referred to as *res gestae* evidence, lays outside the rule's ambit.  *United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012).  "While [*res gestae* evidence] is an exception . . . it does not allow a party to evade 404(b) by introducing any and all other act evidence."  *Id.* (internal citations omitted).  "The principle contains severe limitations as to 'temporal proximity, causal relationship, or spatial connections' among the other acts and the charged offense.'"  *Id.* (quoting *United States v. Hardy*, 228 F.3d 745, 749 (6th Cir. 2000)).  Thus, *res gestae* evidence must be "inextricably intertwined with the charged offense."  *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) (internal quotation marks omitted).  More specifically, it "may include evidence that is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of the witness's testimony, or completes the story of the charged offense."  *Id.* (citation omitted).  We review a trial court's decision to admit testimony as *res gestae* evidence for an abuse of discretion.  *See United States v. Pratt*, 704 F. App'x 420, 423 (6th Cir. 2017).

Prior to Johnson's first trial, the government notified Johnson that it intended to introduce the testimony of witness "A" and Joshua Angel.**[4]** Witness A was a confidential informant for the KCSD who tipped off law enforcement about Johnson's drug-trafficking activities. Angel knew that Johnson stayed in the house where the Toyota was observed nearby and introduced Johnson to the informant in the month prior to the charged conduct. Further, on a "couple of occasions" prior to the charged events, both witness A and Angel sold the same drugs "along with or for" Johnson. R. 396, PageID 3069–70. These drug sales occurred between three to five weeks prior to the charge date. On each occasion, Angel observed Johnson with a firearm.

Johnson moved to exclude Angel's testimony under Federal Rules of Evidence 403 and 404. He argued that any statements relating to his drug-trafficking activities would unfairly prejudice him and would serve only to prove bad character. The district court denied the motion after finding their testimony admissible as *res gestae* evidence. In doing so, the district court noted that Angel's testimony had the potential to "sort of frame the story or complete the story" of Johnson's introduction to Angel, along with "relevant [] background evidence for why [Johnson] was at the house, why he was in town, and ultimately . . . what was the intention with respect to the drugs they found that were located in the vehicle." *Id.* at 3074. The district court therefore found that the government satisfied all "three [] criteria" for the admission of *res gestae* evidence: "the prior acts occurred within a few weeks of [Johnson's] ultimate arrest. There is [a] spa[t]ial relationship; the same county, the same drug, the same residence being used. So we've got the spa[t]ial, temporal, and the causal." *Id.*

We note that the facts of this case are strikingly similar to *United States v. Chalmers*, 554 F. App'x 440 (6th Cir. 2014). There, the defendant was arrested and charged with multiple felonies after the execution of a search warrant recovered 90 grams of marijuana and a firearm at his residence. *Chalmers*, 554 F. App'x at 442–43. Before trial, the government sought to introduce the testimony of a lay witness who was not only present at the time of the search but had visited the same residence on ten prior occasions to buy marijuana from Chalmers. *Id.* at 444. All of these transactions allegedly occurred about two weeks before Chalmers's arrest. *Id.*

---

**[4]**The transcript of the hearing on Johnson's motion in limine refers to Angel as "Witness C." However, the identity of witness C as Angel was revealed at a later date.

at 445.  The district court admitted this testimony, finding it was *res gestae* evidence and, thus, not subject to Rule 404(b).  *Id.* at 446.  We affirmed, noting that the definition of "background" evidence included evidence that was "part of a continuing pattern of illegal activity."  *Id.* at 450–51 (citing *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995)).

The district court did not abuse its discretion in admitting the evidence.  The close temporal, spatial, and causal proximity between the "couple of" drug deals and the circumstances of Johnson's arrest confirm that Angel's testimony was *res gestae* evidence.  After all, these transactions took place between three to five weeks prior to the charged conduct, involved the same drug, the same residence, the same undercover witness who provided information essential to securing the search warrant in this case, and the same practice of Johnson having a firearm during each of the relevant transactions.  These prior acts establish a pattern of drug activity which, in turn, provides valuable background to Johnson's charged conduct.[5]

### D.  Substantive Reasonableness of Sentence

We generally review the reasonableness of a defendant's sentence for an abuse of discretion.  *United States v. Fleischer*, 971 F.3d 559, 567 (6th Cir. 2020).  Substantive reasonableness, when challenged by a defendant, concerns whether "a sentence is too long."  *United States v. Rayyan*, 885 F.3d 440, 442 (6th Cir. 2018).  This inquiry requires us to consider if "the court placed too much weight on some of the [18 U.S.C.] § 3553(a) factors and too little on others."  *Id*.  A sentence within the Sentencing Guidelines range is presumptively reasonable.  *United States v. Pirosko*, 787 F.3d 358, 374 (6th Cir. 2015).  "Accordingly, a defendant's burden of demonstrating that his below-guidelines sentence is unreasonably long is even more demanding."  *United States v. Fields*, 763 F.3d 443, 455 (6th Cir. 2014) (citations and internal quotation marks omitted).

The district court sentenced Johnson to a below-Guidelines sentence of 300 months' imprisonment.

---

[5]The district court alternatively found that the testimony was admissible under Rule 404(b).  Because we find that the district court did not err in admitting the evidence as *res gestae*, we need not address that separate ground.

One of Johnson convictions was for possession with the intent to distribute 500 grams of a mixture or substance containing methamphetamine. To ascertain the offense level for defendants convicted of trafficking methamphetamine, the Guidelines' Drug Quantity Table employs a 10:1 weight ratio between methamphetamine mixtures and actual methamphetamine or "ice." U.S.S.G. § 2D1.1(c). For example, "10 grams of a methamphetamine mixture is the equivalent of 1 gram of actual methamphetamine or ice. And, in the case of a mixture, the base offense level is to be determined by (1) the entire weight of the methamphetamine mixture or (2) the weight of the methamphetamine (actual), *whichever is greater*." *United States v. Johnson*, 812 F. App'x 329, 332 (6th Cir. 2020) (citation and internal quotations marks omitted).

Johnson argues that the district court erred in its use of the 10:1 ratio because this methodology "is not based upon any accurate factual premise" and "results in unwarranted sentencing disparities." D. 35 at pp.47–48. But a district court's use of the 10:1 ratio is a discretionary decision that cannot, by itself, render a criminal sentence invalid. *See United States v. Kennedy*, 65 F.4th 314, 326 (6th Cir. 2023); *United States v. Mosley*, 53 F.4th 947, 965 (6th Cir. 2022) (finding petitioner's challenge to 10:1 ratio lacked "salience" because the argument "amount[ed] to little more than a policy disagreement[,] . . . which the district court had discretion to reject."); *see also United States v. Brooks*, 628 F.3d 791, 800 (6th Cir. 2011). Therefore, the district court did not abuse its discretion when it declined to reject the 10:1 ratio, and Johnson has failed to rebut the presumption of reasonableness.

## III.

For the foregoing reasons, we **AFFIRM** the district court's judgment.