NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0383n.06

Case Nos. 23-1041/1044

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 10, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| DENNIS CARTWRIGHT, JR., | ) | DISTRICT OF MICHIGAN |
| Defendant - Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: COLE, GIBBONS, and READLER, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Dennis Cartwright was involved in two unrelated, but concurrent, federal criminal matters in the Western District of Michigan. One of the cases focused on Cartwright's involvement in a drug trafficking conspiracy, and the other on his participation in a fraudulent Paycheck Protection Program ("PPP") scheme. Cartwright pled guilty to one count of money laundering in the PPP matter but proceeded to trial in the drug trafficking case. There, a jury found him guilty on three drug-related counts—conspiracy to distribute cocaine, cocaine possession with intent to distribute, and marijuana possession with intent to distribute—and being a felon in possession of a firearm. The district court sentenced Cartwright for both matters in the same proceeding, imposed a within-Guidelines sentence, and ordered him to pay restitution. Cartwright now appeals, challenging aspects of both convictions.

I.

Dennis Cartwright is a Grand Rapids small business owner who tried his hand at various ventures throughout his adult life. He started a construction company in 2005, which was

successful until the financial collapse in 2008, and then a used car lot, Auto Den, in 2013. Amid some personal struggles, Cartwright joined a cocaine trafficking conspiracy in late 2019.

The conspiracy was straightforward and streamlined. Cartwright bought the cocaine from Eiland Johnson, who lived in Detroit. A middleman, Mykael Booker, would drive from Grand Rapids to Detroit, pay Johnson for the cocaine, and return to Grand Rapids to split the haul with Cartwright and help him sell the narcotics in the area.

At some point, federal agents clued into this operation and began investigating. In October of 2020, Drug Enforcement Agency ("DEA") officers obtained authorization to place wiretaps on several phones belonging to members of the conspiracy. Over the next month, agents recorded dozens of calls between Cartwright, Booker, and Johnson, revealing incriminating details about the conspiracy and its operation.

With this information, the agents eventually obtained warrants to search both Cartwright's residence and Auto Den. They found physical evidence of drug trafficking at both locations. For example, officers found 56.3 grams of cocaine at Auto Den along with a digital scale and a rifle. And in Cartwright's home, law enforcement recovered over seven pounds of marijuana, a digital scale, more than $50,000 in cash, and three firearms, one of which was loaded. Cartwright was then arrested, and a grand jury later indicted him on several drug and firearms related offenses.

After he began to traffic narcotics, but before he was arrested, Cartwright joined and contributed to another unrelated conspiracy—this time to defraud the government through the Paycheck Protection Program and the Economic Impact Disaster Loan Program. Cartwright participated in this scheme by advising others on how to launder money through fraudulent payroll records in exchange for payment and by applying for PPP loans with false information. He was later indicted and charged with four counts related to wire fraud and money laundering.

Cartwright pled guilty to one count of money laundering in the PPP fraud matter but chose to proceed to trial in his drug trafficking case. There, a jury convicted him on four counts: (1) conspiracy to possess and distribute 500 grams or more of cocaine, (2) possession with intent to distribute cocaine, (3) possession with the intent to distribute marijuana, and (4) being a felon in possession of a firearm.[1]

The district court sentenced Cartwright for both cases at the same hearing. In preparation for the hearing, the Probation Office prepared Cartwright's Presentence Investigation Report ("PSR") and submitted it to the parties for review. The PSR included a number of enhancements to Cartwright's base offense level, including one under U.S.S.G. § 2D1.1(b)(1) for possessing a dangerous weapon during the course of the drug conspiracy. The PSR also noted that Cartwright was obligated to pay $329,714 in restitution as a result of his guilty plea. Although Cartwright's counsel objected to some of the factual and legal matters in the PSR, including the dangerous weapon enhancement, he did not object to the proposed order of restitution.

At the sentencing hearing, the district court first reviewed the parties' objections to the PSR. The court confirmed that neither party disputed the factual content of the report before moving on to Cartwright's three legal objections. After recounting the parties' written arguments, the court overruled each of Cartwright's objections, including his objection to the dangerous weapon enhancement. The district court then outlined the range of possible penalties associated with each count of conviction and noted that Cartwright would owe $329,714 in restitution before asking the parties if it made any calculation mistakes. Both parties confirmed that the district court was correct in its assessment. The district court then sentenced Cartwright to 97 months

---

[1] The jury acquitted Cartwright of conspiracy to conceal money laundering and on possessing a firearm in furtherance of drug trafficking.

imprisonment on his cocaine and firearms charges, 60 months for marijuana trafficking, 60 months on the PPP money laundering matter, and reiterated the $329,714 restitution amount. These sentences were to run concurrently. Before ending the hearing, the district court, once again, asked if there were any legal challenges to the sentence imposed, and neither party indicated that there were such challenges. This appeal followed.

II.

On appeal, Cartwright raises several issues related to his pretrial motions, trial, sentence, and the validity of his plea agreement. Ultimately, Cartwrights asks this court to vacate his conviction and invalidate his plea agreement. We address each issue in turn.

1. Continuance Denial

Cartwright first argues that the district court erred in denying his continuance request in the days leading up to trial. To support the request, Cartwright's counsel suggested that a combination of recent events—a third superseding indictment adding two additional charges, the government's production of a significant number of records and documents, and the government's motion in limine filed the night before trial—rendered him, a solo practitioner, unprepared to proceed and warranted an ends-of-justice continuance. Cartwright contends that the district court, in denying the motion, violated his constitutionally protected due process and fair trial rights.

We review a district court's decision to deny a motion to continue a trial for abuse of discretion. *See United States v. Amawi*, 695 F.3d 457, 480 (6th Cir. 2012). District courts are afforded "a great deal of latitude in scheduling trials and, therefore, must be given broad discretion to determine whether to grant continuances." *United States v. Walden*, 625 F.3d 961, 964 (6th Cir. 2010). As a result, a district court abuses its discretion in this circumstance "only if there is an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for

delay.'" *United States v. Warshak*, 631 F.3d 266, 298 (6th Cir. 2010) (quoting *United States v. Gallo*, 763 F.2d 1504, 1523 (6th Cir.1985)). For the denial of a continuance to constitute reversible error, a defendant must also demonstrate prejudice "by showing that a continuance would have made relevant witnesses available or added something to the defense." *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997).

The district court's denial of Cartwright's continuance was neither unreasoned nor arbitrary. To the contrary, the district court addressed counsel's various concerns and provided a thoughtful and reasoned explanation for its action. To start, the court noted the age of the prosecution. The government first included Cartwright in the underlying criminal complaint in November of 2020, and his counsel had been on the case ever since. About two-and-a-half years elapsed before the trial ultimately began. In that time, the district court granted four continuances: three on behalf of Cartwright and one on the motion of a co-defendant. And in each order granting Cartwright a continuance, the district court noted that Cartwright's counsel sought additional time to review discovery. The district court found that Cartwright's counsel had ample time to prepare for trial and that any additional continuance would amount to an unreasonable delay.

The district court also addressed counsel's complaint regarding the government's recent, voluminous discovery production. Counsel asserted that the continuance was necessary because he was unable to digest the additional records and exhibits that the government provided only a few weeks before trial. The district court noted, however, that counsel was already in possession of many of the documents he claimed were new, and that the remaining documents and exhibits were long available for his review on request.[2] Because counsel had plenty of time to review the

---

[2] Cartwright's counsel also failed to proffer what documents were new, what information he hoped to verify given the new documents, what witnesses he hoped to call in light of these documents,

necessary documents, and because counsel's reasoning simply mirrored that of his previous continuance requests, the district court denied the motion.

Afterwards, the district court addressed counsel's point regarding the government's late motion in limine. Counsel sought the continuance, in part, to respond to the motion, which he claimed impacted Cartwright's ability to present a defense related to the conflict between marijuana laws at the state and federal level. The district court, however, found that that reasoning did not justify a continuance. It noted that Cartwright's marijuana defense was a legal question and, therefore, not to be decided by the jury. Further, the court recalled that it instructed Cartwright, during the final pretrial conference, to file a motion regarding the possible defense, and that his failure to do so did not warrant another continuance. Even still, the court instructed Cartwright that he could move to reconsider its decision to grant the motion if he found a viable argument supporting the defense before presenting his case-in-chief.

Finally, the district court turned its focus to the recent superseding indictment. Cartwright's counsel suggested he needed additional time to address the two new charges it contained. The district court disagreed. It explained that the evidence and information supporting these new changes was disclosed in the government's initial discovery production and that Cartwright's counsel was on notice that these additional charges might be brought. As a result, the court found that Cartwright had plenty of time to prepare for this possibility.

The district court's thoughtful and detailed reasoning for denying Cartwright's fourth continuance did not amount to an "unreasoning and arbitrary 'insistence upon expeditiousness in

---

or any other sentiment that would demonstrate prejudice. When prompted for this information at oral argument, Cartwright's counsel could not supply the necessary information.

the face of a justifiable request for delay.'"  *Warshak*, 631 F.3d at 298 (quoting *Gallo*, 763 F.2d at 1523).  As a result, the district court did not abuse its discretion.

2.  Government's Exhibits

Cartwright next argues that the district court erred in admitting several of the government's exhibits during trial.  He points to four instances of claimed error, only some of which he raised at trial.  Cartwright now argues that each of these admitted exhibits "tainted the fairness and integrity of the proceedings" and warrants relief.  CA6 R. 36, Cartwright Br., 34.  In review, however, we hold that any error committed was harmless.

We review preserved challenges to a district court's evidentiary rulings for abuse of discretion.  *United States v. Kettles*, 970 F.3d 637, 642 (6th Cir. 2020).  In doing so, we ask "whether the district court (1) misunderstood the law . . ., (2) relied on clearly erroneous factual findings, or (3) made a clear error of judgment."  *United States v. Chavez*, 951 F.3d 349, 357–58 (6th Cir. 2020).  But even if a district court abused its discretion, a defendant is entitled to relief only if the error is not harmless; i.e., the error does not warrant reversal if "we have a 'fair assurance' that the verdict was *not* 'substantially swayed' by the error."  *Kettles*, 970 F.3d at 643 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).  However, if the challenged evidentiary matter is raised for the first time on appeal, we review the dispute for plain error.  *United States v. Daneshvar*, 925 F.3d 766, 775 (6th Cir. 2019).  In that case, a defendant must show that (1) an error occurred; (2) the error was obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  *See United States v. You*, 74 F.4th 378, 388 (6th Cir. 2023).

First, Cartwright contests the district court's admission of government's exhibit 58a over his objection.  The exhibit, included below, was admitted as a summary exhibit that depicts

Cartwright in a chart atop his three co-conspirators. Cartwright and the others are connected on the chart with annotated lines that account for the number of phone contacts between two parties over a set date range. He contends that the exhibit violated both Federal Rule of Evidence 1006, because its contents were "embellished" in "placing [him] at the top in a red box," and Rule 403, because "the very layout of [the exhibit] is prejudicial" and misled jurors into believing that Cartwright was "a leader of some type of organization."



Second, Cartwright renews his challenge to the admittance of government's exhibits 208 and 209. Exhibit 208 is a chart that compares Auto Den's actual recorded car sales with the auto sales that Cartwright reported to the Michigan Secretary of State and a list of deposits made into suspect bank accounts investigated in this matter. Exhibit 209 consists of a chart detailing six bank accounts associated with the members of the money laundering conspiracy, visual representations

of money being exchanged from each account, and a list at the bottom outlining the number of transfers between specific accounts along with the transaction totals. Cartwright contends that these exhibits were improper under Rule 1006 because they were inaccurate and incomplete, providing a fractured view of the facts to the jury.

Finally, Cartwright claims, for the first time on appeal, that the district court erred in admitting government's exhibit 124. Exhibit 124 is a photo of an evidence bag containing assorted, unorganized United States currency originating from "a safe in [Cartwright's home] office closet." CA6 R. 52, Gov. Br., 30. The DEA agent who took the photograph and recovered the currency also testified at trial. There, the agent specified that, although he placed only the currency in the evidence bag, some of the currency found inside of the safe was also packaged inside envelopes. Cartwright argues that this admission demonstrates that exhibit 124 "inaccurately displayed evidence and encouraged the jury to make a decision about [his] finances on an improper basis." CA6 R. 36, Cartwright Br., 34.

Even if we assume error, none of these instances warrant relief. To start, any error stemming from the admission of government exhibit 58a was harmless. The government did not endeavor to peg Cartwright as the leader of a drug trafficking conspiracy, only that he was a member of one. To the contrary, the government acknowledged that Cartwright was not the orchestrator of the conspiracy. Cartwright's placement in the chart, therefore, did not subliminally serve the government's theory; the government's argument relied on Cartwright's inclusion in the chart generally, not at the top specifically. Additionally, the proof that the government submitted to the jury underlying the summary exhibit, namely the dozens of recordings that the government captured of Cartwright speaking with Johnson and Booker about drug related activity, provided ample evidence of his involvement in a narcotics distribution conspiracy. The impact of the

underlying evidence itself, in combination with the evidence presented from the searches of Cartwright's residence and workplace, gives us "a 'fair assurance' that the verdict was *not* 'substantially swayed' by" Cartwright's placement at the top of the chart in exhibit 58a. *Kettles*, 970 F.3d at 643 (quoting *Kotteakos*, 328 U.S. at 765).

Likewise, if any error occurred in admitting government's exhibits 208 and 209, those errors were also harmless. Demonstrably so, because the jury acquitted Cartwright on the money laundering charge that these exhibits attempted to prove. Despite this fact, Cartwright argues that these exhibits "impacted counts beyond [] money laundering" because the government tied that count to his drug trafficking proceeds. CA6 R. 53, Cartwright Reply, 13. But this argument lacks merit. Not only did the government produce a substantial amount of independent evidence on the narcotics trafficking charges, but the elements that the government needed to prove to convict Cartwright on the money laundering count were separate and distinct from those of the drug trafficking offenses. As a result, any errors resulting from the exhibits were harmless. *See United States v. Suarez*, 263 F.3d 468, 484 (6th Cir. 2001); *United States v. Phillips*, 872 F.3d 803, 810–11 (6th Cir. 2017).

Finally, even if the district court erred in admitting government's exhibit 124, Cartwright has not met the requirements for plain error relief. Cartwright has "'the burden of establishing entitlement to relief for plain error,'" which includes "establishing each of the four requirements for plain-error relief." *Greer v. United States*, 593 U.S. 503, 508 (2021) (citations omitted). Here, however, even assuming Cartwright established the first two prongs in this inquiry, he made no mention of how any error rooted in exhibit 124 met the third and fourth prongs of the plain error test. And we will not make these arguments on his behalf. *See Tillman Transp., LLC v. MI Bus.*

*Inc.*, 95 F.4th 1057, 1064 (6th Cir. 2024). As a result, Cartwright failed to meet his burden and is not entitled to relief.

3. Hearsay or Impeachment Recording

Cartwright next contends that the district court erred in excluding a recorded conversation between him and co-defendant Johnson as hearsay. He argues that the recording was admissible both to impeach DEA Agent Giudice's testimony on cross examination and during his case-in-chief under several hearsay exceptions. In excluding the recording, Cartwright claims, the district court committed reversible error.

Federal Rule of Evidence 801(c) defines hearsay as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Although we review a district court's evidentiary rulings under the abuse of discretion standard, the issue of "whether a statement is hearsay is a legal question that we review de novo." *United States v. Porter*, 886 F.3d 562, 566 (6th Cir. 2018) (order). This, of course, includes whether the evidence fell within an exception to the hearsay rule. *See* Fed. R. Evid. 803. "When a trial court refuses to admit evidence on hearsay grounds, counsel must explain whether a hearsay exception applies . . . [o]therwise, the district court has no opportunity to consider the meaning of the exception and no opportunity to address its applicability." *United States v. Arnold*, 486 F.3d 177, 193 (6th Cir. 2007) (en banc). In that circumstance, the plain error rule applies. *Id.*

The at-issue recording stems from a conversation between Cartwright and Johnson on November 1, in which Johnson indicated that he left an expensive pair of sunglasses at Cartwright's house. Cartwright sought to introduce the recording to propose an innocent purpose

for the pair's meeting on November 4, and to rebut Agent Giudice's testimony, in which she claimed that the two met that day to exchange the proceeds of their drug trafficking operation.

Cartwright first tried to admit the recording to impeach Agent Giudice on cross examination, claiming that, because she had heard the conversation about returning the sunglasses via the wiretap, she acted "falsely and deliberately" in telling the jury that the reason for the meeting was drug-related; therefore, the call "impeaches what she said happened on November 4th." The district court found that the recording could not be used for impeachment and prohibited its admission. Cartwright then tried to use the recording in his case-in-chief, arguing that it fell within the residual hearsay exception under Federal Rule of Evidence 807. The district court again found the recording inadmissible, this time remarking that Cartwright's direct testimony about the interaction is more probative to his theory than the recording, making the residual exception inapplicable. Cartwright now renews his previous admissibility arguments, and he adds that the district court plainly erred in failing to admit the recording sua sponte under the state-of-mind exception and the res gestae doctrine. *See* Fed. R. Evid. 803(3); *United States v. Brown*, 888 F.3d 829, 936 (6th Cir. 2018).

The district court correctly found that the recording was inadmissible, both on cross examination and in Cartwright's case-in-chief. As for its admissibility on cross examination, Cartwright sought to use the recording to impeach Agent Giudice by contradiction. *See United States v. Craig*, 953 F.3d 898, 904 (6th Cir. 2020). He claimed that Giudice's testimony about the November 4 meeting with Johnson was inconsistent with the November 1 recorded conversation, and that the recording put into question Giudice's credibility. But, as the district court explained, Giudice's testimony and the recorded conversation were not mutually exclusive. Cartwright and Johnson could have met on November 4 to both conduct an illicit money transfer *and* for

Cartwright to return Johnson's sunglasses. Additionally, based on our understanding of the record, the recording made no mention of when, or where, Cartwright was to return Johnson's sunglasses. And absent specific details, a call made three days before the pair met cannot undermine Giudice's testimony on the meeting's purpose. As a result, the recording could not be used to attack Giudice's credibility, and it was not admissible for impeachment purposes.

In his case-in-chief, Cartwright wanted to use the recording to substantiate his trial testimony that he met with Johnson on November 4 to return his sunglasses. The statement is hearsay and inadmissible as a result; specifically, he sought to introduce the statement for the truth of the matter asserted—that he and Johnson met because of the sunglasses—so Cartwright needed to point to an appropriate hearsay exception to admit the recording. Cartwright claimed the statement was covered by Rule 807, the residual exception. But as the district court explained, that exception is inapplicable.

A hearsay statement not exempted under Rules 803 or 804 can still be admitted under the Rule 807(a) residual exception if:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Here, considering that he had already testified about the meeting, Cartwright has not shown that the recording satisfied the second requirement of Rule 807—that is, that the recording was more probative on his theory of the meeting than his statement to the jury. What is more, because the recording did not set out a date or time that he was to return the sunglasses to Johnson, Cartwright's trial testimony about the November 4 meeting's purpose was, in fact, more probative on the theory than the November 1 call.

But even if the district court erred in refusing to admit the recording, either through Rule 807 or in failing to sua sponte invoke the state-of-mind exception or the res gestae doctrine, any error was harmless. The government—through recorded conversations, law enforcement testimony, long-term surveillance, and physical evidence gathered from a search of his home and workplace—submitted overwhelming evidence that Cartwright engaged in narcotics trafficking. For example, it played several recorded conversations and videos for the jury to outline every step of the drug conspiracy's process. First, the government submitted various calls between Cartwright and Johnson or Booker discussing the quantity, quality, and price of cocaine. The recordings also captured Cartwright calling Booker and directing him to meet with Johnson in Detroit. The government then played videos from Booker's phone, created around the same time as his phone calls with Cartwright, depicting him showing off large amounts of currency and substances that resembled cocaine. Afterwards, the government proffered recordings of Cartwright's conversations with Johnson after Booker returned from Detroit, in which Johnson inquired whether Booker and Cartwright had enough cocaine and when he could collect the remaining money owed. These recordings also captured conversations between Cartwright and Booker planning to purchase cocaine, discussing how much product was purchased, arranging time to meet and divide up the narcotics, and attempting to gather money to repay Johnson. Lastly, the recordings demonstrated that both Booker and Johnson met at Cartwright's home several times, seemingly to exchange the proceeds of their trafficking activities. With this evidence, the government painted a picture of the conspiracy's hierarchy for the jury. Johnson supplied the cocaine from Detroit, Booker purchased and transported the cocaine between Detroit and Grand Rapids, and Cartwright and Booker both diluted the product and further distributed the narcotics.

The recordings were not the only evidence supporting Cartwright's involvement in trafficking and the conspiracy. The government also found cocaine in Cartwright's office closet at Auto Den; seven pounds of marijuana and a digital scale at his residence; and several firearms, both in his home and at his workplace. With the physical evidence and the recordings, the government submitted overwhelming proof of Cartwright's guilt. As a result, any error that the district court caused in failing to admit the November 1 recording of Cartwright and Johnson was harmless.

4. Cumulative Error

Following this, Cartwright attests that if the individual errors were insufficient, then the cumulative effect of the errors was unduly prejudicial and violated his due process and fair trial rights.

To prevail under the cumulative-error analysis, Cartwright "must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Underwood*, 859 F.3d 386, 395 (6th Cir. 2017) (quoting *United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009)).

As mentioned above, several of the issues that Cartwright raises are not errors and are therefore not contemplated in our cumulative-error analysis. *See United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012). But even considering the few instances where we assumed error, as with the admitted exhibits, their combined impact is far from sufficiently prejudicial to render Cartwright's trial constitutionally problematic. The overwhelming evidence of Cartwright's guilt was corroborated by sources untainted by error, dispelling any prejudicial impact stemming from the possible errors. *See Warman*, 578 F.3d at 349.

5. Sentencing Enhancement

Cartwright next argues that the district court improperly applied a two-level enhancement to his base offense level for possessing a dangerous weapon under U.S.S.G. § 2D1.1(b)(1). Specifically, he claims that the government failed to meet its burden under the enhancement and that the district court improperly evaluated the government's submission. We disagree.

In evaluating the application of a Guidelines enhancement, we review the district court's legal conclusions, including its interpretation of a Guidelines provision, de novo and its factual findings for clear error. *United States v. Flores*, 974 F.3d 763, 765 (6th Cir. 2020).

Section 2D1.1(b)(1) of the Sentencing Guidelines permits a district court to levy a two-level enhancement to a defendant's base offense level "[i]f a dangerous weapon (including a firearm) was possessed" during a drug conspiracy or trafficking offense. The Guidelines' commentary further notes that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1 cmt. n. 11(A).

Our circuit has embraced a burden-shifting framework for establishing whether the dangerous weapon enhancement applies. *See United States v. Kennedy*, 65 F.4th 314, 318 (6th Cir. 2023). The onus is first on the government to "establish[] by a preponderance of the evidence that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense." *Id.* (quoting *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007)). And if it meets that requirement, "the burden shifts to the defendant to show that it was clearly improbable that the weapon was connected to the offense." *Id.* (quoting *Catalan*, 499 F.3d at 606).

During Cartwright's sentencing hearing, the district court applied the enhancement after finding that the government established both elements and that Cartwright failed to show that it was clearly improbable that his firearms were connected to the trafficking offenses. On appeal, Cartwright focuses his challenge on the first leg of the burden-shifting framework. In particular, Cartwright states that the government did not show a nexus between his possession of firearms and any drug trafficking activity. Cartwright's reasoning, however, is flawed.

The government met its burden, and the district court properly applied the enhancement. To start, there is no question that Cartwright possessed several firearms. During the search of his home, agents found three firearms in an office desk, one of which was loaded. Considering this evidence, the jury found Cartwright guilty of being a felon in possession of a firearm. This proof is sufficient for the government to meet the first prong of the enhancement.

Likewise, Cartwright possessed these firearms during the commission of the trafficking and conspiracy offenses. We have long held that the second prong of the dangerous weapons enhancement is satisfied when "the weapon was present when the arrest took place or where the crime was committed." *Kennedy*, 65 F.4th at 323 (quoting *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991). And under these circumstances, "once the government proves a defendant was in possession of a weapon, its burden is satisfied." *Sanchez*, 928 F.2d at 1460.

Here, the firearms were present in Cartwright's basement, where part of his drug trafficking and conspiratorial activity occurred. The firearms were found in close proximity to drugs and tools of drug trafficking: namely a digital scale and seven pounds of marijuana. In addition to the evidence of drug trafficking, the recorded phone calls introduced at trial showed that Cartwright conducted some of his conspiratorial activity out of his home. Among other things, Cartwright brought Johnson and Booker to his house on several occasions to exchange the proceeds of the

trafficking conspiracy. In pointing to this information, the government met the second prong of its burden under § 2D1.1(b)(1) and showed an appropriate nexus between Cartwright's firearms and drug trafficking activity.[3] Because Cartwright failed to carry his burden, the district court did not err in applying the enhancement.

6. *Bruen*

For the first time on appeal, Cartwright argues that his felon-in-possession conviction under 18 U.S.C. § 922(g)(1) violates the Second Amendment, both facially and as applied to him. Cartwright bases his claim on the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). But because he did not raise this argument before the district court, we review it under the plain error standard. *United States v. Johnson*, 95 F.4th 404, 415 (6th Cir. 2024).

We need not dive into the merits of this argument, however, because our circuit has held, on several occasions, that a defendant cannot succeed in challenging his § 922(g)(1) conviction based on *Bruen* when the claim is subject to plain error review. *Id.* at 416–17 (collecting cases) ("Without precedent explicitly holding that § 922(g)(1) is unconstitutional and because it is unclear that *Bruen* dictates such a result, we find that Johnson has not satisfied the plain-error standard.") Because "[n]o binding case law addresses the constitutionality of § 922(g)(1) in light of *Bruen*," and because it is not obvious that § 922(g)(1) is unconstitutional under *Bruen*, we cannot say that Cartwright's conviction constituted plain error. *United States v. Bowers*, No. 22-6095, 2024 WL 366247, at *3 (6th Cir. Jan. 31, 2024).

---

[3] Cartwright heavily relies on *Kennedy* to stress that the government failed to establish a nexus between the firearms and the drug activity. However, the heighted discussion of a nexus in *Kennedy* applies only when "no weapon was found on the defendant or where the crime was committed." 65 F.4th at 323. That is not the case here.

7. Knowing and Voluntary Plea

Moving onto the claims stemming from PPP loan case, Cartwright asks this court to vacate his plea agreement, arguing now that it was not made knowingly and voluntarily. He maintains that the plea agreement was deficient because it did not notify him of the amount of restitution he would owe under the agreement, and that the district court erred in failing to ensure that he understood his restitution obligations in accepting the plea. "Had he understood" the amount of restitution he was required to pay, Cartwright says that "he would not have pled guilty." CA6 R. 33, Cartwright II Br., 19.

A defendant's guilty plea is valid only if he gives it knowingly, voluntarily, and intelligently. *See Brady v. United States*, 397 U.S. 742, 748 (1970). Federal Rule of Criminal Procedure 11 requires that a court verify that the defendant's plea meets this standard; and Rule 11(b) provides a roadmap of topics for courts to broach in order to reach that conclusion. If a court deviates from the requirements of the rule, Rule 11(h) notes that the error is harmless unless the variation affects a defendant's substantial rights. However, if a defendant fails to timely object to a Rule 11 violation, "the more demanding plain error standard" applies. *United States v. Hogg*, 723 F.3d 730, 737 (6th Cir. 2013); *see United States v. Vonn*, 535 U.S. 55, 62–63 (2002).

Cartwright did not object to any Rule 11 violation, and his challenge cannot survive plain error review. In fact, Cartwright's claim fails at the first prong of this standard. To start, the district court did not err, and the plea agreement was not flawed, in failing to reference the exact amount Cartwright owed in restitution when he changed his plea. Rule 11(b)(1)(K) requires only that a court ensures that the defendant be aware of "the court's authority to order restitution[.]" The rule does not mandate that the court inform a defendant of the amount of restitution he will owe. Cartwright's argument is akin to a defendant claiming that his plea was not made knowingly

and voluntarily because the court did not specify his exact Guidelines range at the change of plea hearing. Rules 11(b)(1)(H) and 11(b)(I) require the district court to give notice of "any maximum possible penalty" or "any mandatory minimum penalty" respectively, but the rule "does not require the court to inform the defendant of the applicable Guidelines or how the facts stipulated to in a plea agreement could affect the Guidelines calculation." *United States v. Shabazz*, 530 F. App'x 458, 462 (6th Cir. 2013). It is sensible to require courts to inform defendants of concrete consequences, like the statutorily imposed mandatory minimum and maximum penalties or its ability to order restitution, because those punishments are known at the time that the individual pleads guilty. However, because the total amount of restitution owed is a fact-intensive inquiry, like determining a person's appropriate Guidelines range, courts are not required to immediately provide that information to a defendant at such an early stage of the prosecution. *See* 18 U.S.C. § 3664; Fed. R. Crim. P. 11 Advisory Committee Notes to 1985 Amendments.

For the reasons discussed above, and because he failed to show that Rule 11 requires courts to inform defendants of their exact restitution obligation during a change of plea, we find that Cartwright failed to show that the district court "[d]eviat[ed] from a legal rule," and thus no error occurred. *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Olano*, 507 U.S. 725, 732–33 (1993)).

Even if the district court erred, however, Cartwright failed to show that the violation affected his substantial rights. *See United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). For a defendant to meet this prong of the plain error standard in a Rule 11 context, he "must show a reasonable probability that, but for the error, he would not have entered the plea." *Id.* Going further, "a defendant must thus satisfy the judgment of the reviewing court, informed by the entire

record, that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." *Id.* (internal quotation marks omitted.)

Although Cartwright now claims that he would not have pled guilty had he known the extent of his restitution obligation, his actions, or lack thereof, speak louder than his post-hoc rationalizations. For example, Cartwright's presentence report noted that he would owe $329,714 in restitution, yet he never objected to that conclusion. What is more, when the district court asked Cartwright if he had any questions about its decision at the end of the sentencing hearing, he sought only to clarify the length of the PPP conviction. He did not ask about the restitution amount, and he did not attempt to withdraw his plea. Considering the record as a whole, Cartwright has not shown that earlier notice of the restitution sum would have caused him to pursue trial. As a result, his substantial rights were not affected, and he has not shown that the district court plainly erred.

8. Ineffective Assistance of Counsel

Finally, Cartwright argues that his trial counsel was constitutionally ineffective during his sentencing. As a result of trial counsel's ineffectiveness, Cartwright claims that he was prejudiced and asks the panel to vacate his sentence.

Generally, we do not consider claims for ineffective assistance of counsel on direct appeal. *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012) (citing *Massaro v. United States*, 538 U.S. 500, 504 (2003)). "The preferred route for raising such claims is in a post-conviction proceeding under 28 U.S.C. § 2255, so that the parties can develop an adequate record." *United States v. Reynolds*, 534 F. App'x 347, 372 (6th Cir. 2013). And when an ineffective assistance claim is made on direct appeal, the "record [is] not developed precisely for the object of litigating or preserving the claim and [is] thus often incomplete or inadequate for this purpose." *Massaro*, 538 U.S. at 504–05.

Cartwright's case is not one of the rare exceptions in which bringing an ineffective assistance of counsel claim on direct appeal is appropriate. The record is incomplete and there are several factual questions that remain unanswered, including the extent of his conversations with counsel regarding his sentencing exposure or his restitution liability. We decline to address Cartwright's IAC claim.

III.

For the reasons stated above, we affirm the district court's decisions.